# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 39297

CITIZENS AGAINST RANGE
EXPANSION, an unincorporated non-profit
association; JEANNE J. HOM, a single
woman, EUGENE and KATHLEEN RILEY,
husband and wife, LAMBERT and DENISE
RILEY, husband and wife, GABRIELLE
GROTH-MARNAT, a single woman,
GERALD PRICE, a single man, RONALD
ELDRIDGE and DOROTHY ELDRIDGE,
husband and wife, GLENN and LUCY
CHAPIN, husband and wife, SHERYL
PUCKETT, a single woman, CHARLES and
CYNTHIA MURRAY, husband and wife,
DAVE VIG a single man,

    Plaintiffs-Respondents,

v.

IDAHO FISH AND GAME DEPARTMENT,
an agency of the STATE OF IDAHO, and
VIRGIL MOORE, Director of the IDAHO
FISH AND GAME DEPARTMENT,

    Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Coeur d'Alene, September 2012
Term

2012 Opinion No. 137

Filed: November 15, 2012

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the First Judicial District of the State of Idaho,
Kootenai County. Hon. John T. Mitchell, District Judge.

The post-judgment orders of the district court are <u>reversed</u> and the case is
<u>remanded.</u>

Hon. Lawrence G. Wasden, Attorney General, Boise, for appellants. Kathleen E.
Trever argued.

Scott W. Reed, Coeur d'Alene, and Harvey Richman, Athol, for respondents.
Harvey Richman argued.

_____

1

J. JONES, Justice.

The Idaho Department of Fish and Game (IDFG) appeals the district court's post-judgment orders (1) refusing to lift a portion of an injunction and (2) declaring the Idaho Outdoor Sport Shooting Range Act unconstitutional. We reverse both orders and remand the case for further proceedings.

## I.
## FACTUAL AND PROCEDURAL HISTORY

The Farragut Shooting Range, near Bayview, Idaho, has been owned and operated by IDFG since World War II. It sits on approximately 160 acres and is surrounded by a residential neighborhood, a public road, and hiking trails. Public use of the range has been expanding, from some 176 shooters in 2002, to at least 509 shooters in 2005.

In 2004, IDFG made a public proposal to renovate the range, based on the "Vargas Master Plan," authored by range design expert Clark Vargas. The plan was designed to improve access, noise control, and range management. Citizens Against Range Expansion (CARE), an unincorporated non-profit association comprised of individuals who reside near the range, contended that the plan would greatly increase range usage, and harm the community.

CARE sued IDFG in 2005 for nuisance and other related causes of action regarding the range's operation. CARE's claims were grounded in both safety and noise concerns regarding the increased use of the range, and its proposed expansion. Among other relief, CARE sought to enjoin IDFG's operation of the range. The case proceeded to a court trial in December of 2006 and in February of 2007 the court issued its memorandum decision wherein it determined that CARE was entitled to relief enjoining further operation of the Farragut Range until IDFG completed certain safety improvements.

The court laid out two separate components for lifting the injunction. The first component was for up to 500 shooters per year (the 500-shooter component). This component provided that the Farragut Range would remain closed "to all persons with pistols, rifles and firearms using or intending to use live ammunition until a baffle is installed over every firing position." The court's judgment specified:

> [Each] baffle must be placed and be of sufficient size that the shooter, in any position (standing, kneeling, prone), cannot fire his or her weapon above the berm behind the target. Either the parties shall agree that the baffles have been adequately installed or that issue shall be submitted for view of the premises by the Court. . . .

2

[A]t such time as baffles are installed over every firing position and approved in the manner set forth, [IDFG] may operate the Farragut Shooting Range in the same manner in which it historically has (i.e., without any site supervision), for up to 500 shooters per year.

The second component of the injunction was for opening the Farragut Range to more than 500 shooters per year (the 501-shooter component). This part of the judgment had two concerns—noise and safety. It stated:

[U]se level shall not exceed 500 shooters per year until and unless [IDFG] has constructed and installed safety measures adequate to prevent bullet escapement beyond the boundaries owned and controlled by [IDFG] and constructed and installed noise abatement measures to reduce noise to a decibel level agreed upon by the parties in the first instance, or, if the parties are unable to agree, to be set by the Court following further evidence.

Neither party appealed the judgment. Rather, IDFG began work on addressing the requirements of the injunction. Specifically, it constructed a partially contained 100-yard shooting range, in which it installed baffles "sufficient to prevent shooters from 'directly' firing above the berm behind the target from any of the 12 shooting positions (from prone to standing)."

Although the district court discussed noise standards in its memorandum decision, it did not incorporate any standards in the judgment. During the following legislative session, the Idaho Legislature took action on this subject. In 2008, the Legislature enacted the Idaho Outdoor Sport Shooting Range Act. 2008 Idaho Sess. Laws 322–33. The Act set a uniform noise standard for all state-owned, non-military, non-law enforcement outdoor shooting ranges. I.C. §§ 67-9101, 67-9102. The statute provides that "[t]he noise emitted from a state outdoor sport shooting range shall not exceed an Leq(h) of sixty-four (64) dBA." I.C. § 67-9102(3). Also in the 2008 session, the Legislature passed HB 604 to amend the laws affecting sport shooting ranges in general. 2008 Idaho Sess. Laws 880–81. HB 604 makes references to, and incorporates standards from, the Act. I.C. §§ 55-2604, 55-2605. The effect of HB 604 and the Act is that all non-military outdoor shooting ranges are subjected to the Act's noise standard. I.C. §§ 55-2604, 55-2605, 67-9101, 67-9102.

Upon completion of its range improvements, IDFG filed a Motion for Partial Lifting of Injunction (Relief Motion) for the 100-yard range. IDFG sought to lift both components of the injunction. CARE then moved for summary judgment, claiming that the Act was a special law in violation of art. III, § 19 of the Idaho Constitution, and a deprivation of judicial power in violation

of art. V, § 13.

The district court issued summary judgment in favor of CARE on the constitutional issues in March of 2011. In its order, the court found that the Act was unconstitutional as a special law and a deprivation of judicial power. For this reason alone, it denied IDFG's Relief Motion with regard to the 501-shooter component. The court found that there remained disputed issues of fact regarding range safety. Thus, the court set an evidentiary hearing on IDFG's motion with regard to the 500-shooter component.

On August 25, 2011, following the evidentiary hearing on safety issues, the district court denied IDFG's Relief Motion with regard to the 500-shooter component. Despite finding that the "[t]he baffles at the 100-yard shooting area are sufficient to prevent shooters from 'directly' firing above the berm behind the target from any of the 12 shooting positions," the court concluded that IDFG had still failed to comply with the requirements of the injunction. This was because, it found, the "baffles do nothing to contain ricochets that hit the floor of the range from escaping the range." The court reasoned that the injunction was not just limited to direct fire, but included ricochets, and found that:

> [I]t does not violate I.R.C.P 65(d) to interpret the plain language and context of the Court's 2007 Order condition for up to 500 shooters (the installation of a baffle over every shooting position to prevent a shooter from firing over the berm behind the target), to encompass shooters firing at, below, or in directions to the side of or away from the berm behind the target. Simply because IDFG has installed at least one baffle over all 12 designated shooting positions at the 100-yard shooting area, and such baffles are placed and of sufficient size that a shooter in any position (standing, kneeling, prone) cannot fire his or her weapon above the berm behind the target at the 100-yard shooting area does not mean IDFG has complied with the Court's 2007 condition to lift its 2007 injunction for these 12 designated shooting positions, for up to 500 shooters per year . . . In 2007, this Court was concerned with bullets that went over the back berm. Whether by ricochet or direct fire, the problem is still bullets going over the back berm.

In denying the motion, the district court went on to state that, although the 100-yard range at Farragut did not comply with the 2007 injunction, if IDFG "incorporated any of the simple and relatively inexpensive measures to attempt to contain ricochets," such as "ground baffles in conjunction with overhead baffles . . . and an eyebrow berm or bullet catcher near the top of the back berm," that then, "partial lifting should occur." The court reiterated, however, that for the 500-shooter standard, "complete containment" was not required. IDFG timely appealed to this Court.

4

## II.
## ISSUES ON APPEAL

I.    Did the district court err in concluding that IDFG has not complied with the 500-shooter component of the injunction?

II.   Is the Idaho Outdoor Sport Shooting Range Act an unconstitutional "special law" in violation of art. III, § 19 of the Idaho Constitution?

III.  Was the Legislature's enactment of the Idaho Outdoor Sport Shooting Range Act a deprivation of judicial power in violation of art. V, § 13 of the Idaho Constitution?

IV.   Has IDFG complied with the 501-shooter component of the injunction?

V.    Is CARE entitled to attorney's fees on appeal?

## III.
## DISCUSSION

### A.  Standard of Review.

When reviewing the constitutionality of a statute, this Court exercises free review. *Idaho Sch. For Equal Educ. Opportunity v. State (ISEEO IV)*, 140 Idaho 586, 590, 97 P.3d 453, 457 (2004). To prevail, a challenger must show that the statute is "unconstitutional as a whole, without any valid application." *Id*. This Court makes "every presumption [] in favor of the constitutionality of the statute, and the burden of establishing the unconstitutionality of a statutory provision rests upon the challenger." *Id*.

No prior Idaho case directly addresses the standard for reviewing a lower court's interpretation of an injunction issued under IRCP 65(d). However, other courts have reviewed the interpretation of injunction orders issued under the Idaho rule's federal analog—FRCP 65(d)—and have reached conclusions that are instructive here. For an injunction issued under Rule 65(d), "[a] district court's interpretation of its own order is generally reviewed for abuse of discretion." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 103 (2d Cir. 2009). This is in keeping with the basic principle that a "district court's interpretation of its own order is properly accorded deference on appeal when its interpretation is reasonable." *Cave v. Singletary*, 84 F.3d 1350, 1354 (11th Cir. 1996). Other courts have gone further and found that "[g]reat deference is due the interpretation placed on the terms of an injunctive order by the court who issued and must enforce it." *Alabama Nursing Home Ass'n v. Harris*, 617 F.2d 385, 388 (5th Cir. 1980). Still, this

5

deference is constrained when "the order is too clear to permit any interpretation" contrary to the order's plain meaning. *DirecTV, Inc. v. Leto*, 467 F.3d 842, 844 (3d Cir. 2006).

In accord with these holdings, we will review a district court's interpretation of its injunctive order with an abuse of discretion standard. In other words, we will give a district court's reasonable interpretation of its own injunction deference on appeal, and uphold such an interpretation unless the record shows an abuse of discretion.

**B. The district court erred by refusing to lift the 500-shooter component of the injunction.**

Upon consideration of IDFG's Relief Motion, the district court concluded that IDFG had not complied with the requirements of the 500-shooter component of the injunction. Its reasoning was that because "[the range] as presently in place will not contain rounds that ricochet over the back berm," the plain terms of the injunction had not been satisfied. The court predicted that if IDFG made further improvements that incorporated ground baffles in conjunction with overhead baffles, plus an eyebrow berm or a bullet catcher, then "partial lifting [of the injunction] should occur."

IDFG claims on appeal that its improvements complied with the plain terms specified in the judgment, and therefore the first component of the injunction should be lifted to allow up to 500 shooters per year at Farragut. It further argues that the injunction says nothing about ricochets, and therefore the district court abused its discretion by making ricochets an issue. IDFG also contends that overheard baffles, eyebrow berms, and bullet catchers are not required by the 501-shooter component of the injunction, and therefore it is unreasonable for the district court to read such a requirement into the less stringent 500-shooter component.

CARE argues in response that this Court should defer to the district court's interpretation of the injunction, and agrees with the district court that the injunction is "all-inclusive." It contends in its briefing that the injunction language barring downrange fire above the back berm implicitly includes "ANY and EVERY round fired from the firing line," which would include ricochets.

Idaho's Rules of Civil Procedure govern a court's ability to issue an injunction. I.R.C.P. 65. The scope of an order for an injunction is constrained by Rule 65(d), which states that "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to

the complaint or other document, the act or acts sought to be restrained . . . ." I.R.C.P. 65(d). Courts construing this Rule's federal counterpart have explained that its purpose is to prevent the issuance "of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds," and that "[t]hus, Rule 65(d) 'is satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden' or required." *Petrello v. White*, 533 F.3d 110, 114 (2d Cir. 2008). Accordingly, "[i]n determining whether a particular act falls within the scope of an injunction's prohibition, particular emphasis must be given to the express terms of the order. An injunction does not prohibit those acts that are not within its terms as reasonably construed." *Alabama Nursing Home Ass'n*, 617 F.2d at 388.

Here, the district court's interpretation of the 500-shooter component of its injunction was an abuse of discretion because it took its original, and unambiguous, 500-shooter requirement—installing "a baffle . . . over every firing position"—and expanded it into a requirement for "ground baffles in conjunction with overhead baffles . . . and an eyebrow berm or bullet catcher near the top of the back berm." This interpretation does not follow from the plain language of the injunction because the judgment never referred to these other devices. Moreover, preventing bullet escapement via ricochet—the stated rationale for requiring these additional improvements—was similarly absent from the judgment. Although a district court is given deference in its interpretation of its own order, that deference cannot extend so far as to allow interpretation to become revision. Asking IDFG to now comply with requirements that the judgment never contained, to achieve objectives that the court never specified, is a far cry from the requirement that "the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden." Indeed, even now IDFG cannot be certain that complying with the attempted revision of the injunction language will ultimately be sufficient to lift it, because the district court stated that new baffles, eyebrow berms, and bullet catchers "should" result in a partially lifted injunction—but it gave no guarantees.

Perhaps the most baffling conclusion reached by the district court is contained in the following statement:

> Simply because IDFG has installed at least one baffle over all 12 designated shooting positions at the 100-yard shooting area, and such baffles are placed and of sufficient size that a shooter in any position (standing, kneeling, prone) cannot fire his or her weapon above the berm behind the target at the 100-yard shooting area does not mean IDFG has complied with the Court's 2007 condition to lift its

7

> 2007 injunction for these 12 designated shooting positions, for up to 500 shooters per year.

When the factual substance of this statement is compared with the express terms of the 500-shooter component of the injunction—that a baffle be installed over every firing position, to be "placed and be of sufficient size that the shooter, in any position (standing, kneeling, prone), cannot fire his or her weapon above the berm behind the target"—it is obvious that IDFG has complied. The district court's explanation of what IDFG has done, and the text of the injunction, are identical. Consequently, the court's statement essentially says that, "[s]imply because [IDFG has complied with the express terms of the injunction,] does not mean that IDFG has complied with the Court's 2007 condition to lift its injunction." Reading the plain language of the injunction to reach this unsupportable conclusion was clearly an abuse of the district court's discretion, requiring reversal. Accordingly, we lift the injunction to allow IDFG to open the Farragut Range for up to 500 shooters per year.

### C. The Act is a constitutional general law, and not a special law.

The district court granted summary judgment to CARE on the 501-shooter component based solely on its conclusion that the Act was unconstitutional. It concluded that the Act was a special law violative of art. III, § 19 the Idaho Constitution and a deprivation of judicial power in violation of art. V, § 13. The court's conclusion that the Act was a special law is based on findings that: 1) the Act does not apply to all outdoor shooting ranges in like situations; 2) the legislative history showed that the Act has a single, illegitimate purpose—to benefit IDFG in this litigation; and 3) the Legislature passed the Act in an arbitrary, capricious, and unreasonable manner. Because the district court determined that the Act was a special law that limited "civil and criminal actions," it held that it was unconstitutional, and an improper basis for lifting the 501-shooter component of the injunction.

On appeal, IDFG argues that the Act is a general law, and not a special law. It first contends that the Act must be considered in tandem with HB 604. IDFG's position is that the Act and HB 604, when taken together, apply a statewide noise standard to all non-military outdoor shooting ranges; thus, the Act functions as a general law. Alternatively, IDFG argues that the Act is a general law, even if HB 604 is not considered, because all state-owned shooting ranges within the Act's scope are subject to it. IDFG further argues that the Act is not a special law because it was not enacted in an arbitrary, capricious, or unreasonable manner. Finally, IDFG

contends that even if the Act is a special law, it is not one of the prohibited types of special laws enumerated in art. III, § 19, and is therefore constitutional.

In response, CARE argues that the Act is a special law because it applies only to four state-owned shooting ranges in Idaho, and "three of [these] are so isolated that noise levels have no meaning."[1] Based on this, and pertinent legislative history, CARE contends that the Act was truly designed to affect only the Farragut Range, and this lawsuit.

General laws are those laws that "apply to all persons and subject matters in a like situation," and they are constitutional for the purposes of Article III, § 19 of the Idaho Constitution. *Arel v. T & L Enter., Inc.*, 146 Idaho 29, 35, 189 P.3d 1149, 1155 (2008); *see also ISEEO IV*, 140 Idaho at 591, 97 P.3d at 458; *Moon v. North Idaho Farmers Ass'n*, 140 Idaho 536, 546, 96 P.3d 637, 647 (2004); *Jones v. State Bd. of Med.*, 97 Idaho 859, 876–77, 555 P.2d 399, 416–17 (1976). On the other hand, § 19 provides that "[t]he legislature shall not pass local or special laws" if those laws are enacted, among other things, "[f]or limitation of civil or criminal actions." IDAHO CONST. art. III, § 19. This provision is modeled after similar state constitutional prohibitions aimed at "prevent[ing] legislation bestowing favors on preferred groups or localities." *Jones*, 97 Idaho at 876, 555 P.2d at 416.

This Court has clearly set forth three characteristics of special laws. First, "[a] special law applies only to an individual or number of individuals out of a single class similarly situated and affected or to a special locality." *ISEEO IV*, 140 Idaho at 591, 97 P.3d at 458. It is important to note that "[a] law is not special simply because it may have only a local application or apply only to a special class if, in fact, it does apply to all such cases and all similar localities and to all belonging to the specified class to which the law is made applicable." *Id.* Second, we have found that when the Legislature pursues a "legitimate interest in protecting citizens of the state" in enacting a law, then it is not special. *Id.* Lastly, courts must determine "whether the [statute's] classification is arbitrary, capricious, or unreasonable." *Arel*, 146 Idaho at 35, 189 P.3d at 1155. If a law's classification is arbitrary, capricious, or unreasonable, it is a special law. *Id.* In assessing the legitimacy of a particular law, as well as whether it is arbitrary, capricious, or unreasonable, this Court has on occasion examined not just the law itself, but its legislative history. *Kirkland v. Blaine Cnty. Med. Ctr.*, 134 Idaho 464, 470, 4 P.3d 1115, 1121 (2000).

---

[1] The other three ranges referred to are the Black's Creek Range, the Garden Valley Range, and the George Nourse Range.

The Act is a general law because it applies to all shooting ranges in like situations. This is true whether the Act is considered in conjunction with HB 604, or in isolation. IDFG urges that this Court analyze the Act along with HB 604, and that when "taken together, these two laws subject all current and future outdoor shooting ranges" in Idaho to the same noise standard. Idaho's case law supports this kind of analysis. For example, in *Moon*, a "sole [statutory] provision" was alleged to be an unconstitutional special law. *Moon*, 140 Idaho at 547, 96 P.3d at 648. We did not look to that provision in isolation, but rather, at how the provision would function within the entire statutory scheme created by the bill at issue. *Id.* Because the Act and HB 604 deal with the same subject matter, make internal references to one another, and were passed within seventeen days of one another, logically, that same principle from *Moon* could be applied here. Taken together, the Act and HB 604 certainly apply equally to shooting ranges in like situations—their combined effect is that the same noise standard applies to all non-military outdoor shooting ranges. *See* I.C. §§ 55-2605, 67-9102. Because the noise standard set forth in the Act and HB 604 would apply equally to all similarly situated outdoor ranges, the Act is a general law.

However, even if we did not consider the combined effect of the Act and HB 604, and looked solely to the Act, it would still be a general law. This is because the Act and its noise standard applies equally to all non-law enforcement, non-military, state-owned shooting ranges. I.C. §§ 67-9101(3), 67-9102(2).

While CARE concedes that the Act is indeed "directed at all state owned shooting ranges," it argues that the Act is not general because it affects only four ranges, "three of which are so isolated that noise levels have no meaning and two of which are entirely upon open land devoid of any habitation within gun range." But this is immaterial. "A law is not special simply because it may have only a local application or apply only to a special class if, in fact, it does apply to all such cases and all similar localities and to all belonging to the specified class to which the law is made applicable." *ISEEO IV*, 140 Idaho at 591, 97 P.3d at 458. Here, the Act's noise standard is applicable to the specified class of state-owned shooting ranges, and it applies equally to all ranges within that class. The fact that there may be a small number of such ranges in existence, or that some of those ranges happen to be in less populated areas, does not mean that the noise standard applies any less forcefully across the board. Simply put, the exact same noise standard applies to the Farragut Range, as to the Black's Creek Range, as to the Garden Valley Range, as

to the George Nourse Range. Not only that, but the Act will also affect any future state-owned shooting ranges within its scope. Because the Act applies equally to all state-owned shooting ranges in like situations, it meets the definition of general legislation.

The Act not only meets the standard for general laws, but it has none of the hallmarks of special laws. First, the Act does not disproportionately affect one member of a similarly situated class—it applies equally to all state-owned shooting ranges meeting its criteria. Second, the Act does not have an illegitimate purpose. CARE disagreed, as did the district court, which found it "difficult to see what 'legitimate interest in protecting the citizens of the state' is accomplished by [the Act]." But the district court's own factual findings undercut this—it admitted that "[c]ertainly there is a noise standard being established, and that protects citizens, but the real focus of the Act is to immunize the 'state.'" Though the noise standard does not truly "immunize" the State—at most, it could make compliance with one component of the injunction easier—the crucial finding is that the noise standard protects citizens. This Court simply looks to whether a statute has a legitimate purpose, and a state protecting its citizens with a noise standard is unquestionably that. Finally, the Act is not arbitrary, capricious, or unreasonable. The district court found that it was, because the Legislature "a) did not ask for any scientific information, b) accepted information [that] is incomplete and at times false, and c) either failed to realize (best case) or ignored the fact (worst case) that what they were being asked to do was in direct response to litigation." Even if these findings were correct, they would provide no basis for declaring the Act to be arbitrary, capricious, or unreasonable. There is no requirement that the Legislature ask for or utilize scientific information in carrying out its legislative duties. Nor is it banned from accepting information that is not complete or totally accurate. Nor must it refrain from carrying out its constitutional duties when decisions of this or other courts in the State indicate a potential need for remedial legislative action. If we were to accept the district court's findings as grounds for holding legislative acts to be arbitrary, capricious, or unreasonable, a wide range of legislative acts would likely be in jeopardy. There is simply no indication in the record that the Legislature's decision-making was arbitrary, capricious, or unreasonable.

In arguing that the Act was an unconstitutional special law, CARE emphasized the legislative history of the Act. Its contention is that the "legislative record here . . . is explicitly aimed" at Farragut alone, and that the Act was not meant to apply at any other range. The district court agreed, and quoted from the legislative history at length. While the Act's legislative history

11

does contain specific references to Farragut and to this litigation, this does not affect its constitutionality, for two reasons. First, though this Court has examined legislative history in assessing whether a law is legitimate, or whether it is arbitrary, capricious, or unreasonable, it has not done so when determining to whom or what a law applies. This was the case in *ISEEO IV*, where we found that "the language of the bill plainly states that it is meant to specifically apply" to the ISEEO IV litigation. *ISEEO IV*, 140 Idaho at 592, 97 P.3d at 459. Our sole concern there was the statute's text, and not its legislative history. And the language of the statute there was "aimed at essentially disbanding the ISEEO case and restructuring it in a manner that destroys the Plaintiffs' cause of action against the Legislature." *Id.* Here, the Act itself makes no mention of Farragut, nor does it attempt to "destroy" CARE's cause of action; it just applies a noise standard to a certain type of state-owned shooting range, of which there are several, and of which the Farragut Range is one. And, even if the Act was meant to apply just to this one facility, that would not make it a special law. To follow CARE's line of reasoning, the Legislature would never be able to set safety standards for a one-of-a-kind State facility without running afoul of art. III, § 19. That would perhaps bode ill for limiting the level of noise in the State Capitol.

But beyond this, even if the Act's legislative history should be considered, the district court made no serious effort to meet its burden of making "every presumption [] in favor of the constitutionality of the statute" while doing so. To the contrary, while quoting legislative history, the district court emphasized references to Farragut while quoting legislative history, and minimized references to other shooting ranges statewide.[2] Presuming the Act is constitutional

---

[2] For example, the district court quoted the House Resources and Conservation Committee like so:

> The last item of business on the agenda was HB 515. Rep. Eskridge presented this bill which creates a new section in Idaho Code to provide for the operation and use of State outdoor shooting ranges. **Rep. Eskridge explained that this bill also helps deal with the the litigation issue at Farragut State Park** and will help protect the State against similar litigation in the future.
> ***
> Sharon Kiefer, representing [IDFG] stood to testify in favor of HB515. She reviewed the merits of this bill and related that **[IDFG] has worked closely with the Attorney General's Office to address noise related issues raised in litigation at Farragut State Park** and future concerns at other ranges.

(Emphasis in original.) The district court's use of boldface portrays the Act as being targeted at Farragut. But making every presumption of constitutionality—that is, as to the Act's general character—leads to completely different emphases:

> The last item of business on the agenda was HB 515. **Rep. Eskridge presented this bill which creates a new section in Idaho Code to provide for the operation and use of State outdoor**

12

would require at least a neutral reading of its legislative history, which indeed refers to more ranges than just Farragut, and more circumstances than just this litigation. Thus, even if the Act's legislative record was a proper area for this Court's consideration on appeal, that record, fairly considered, does not show that the Act is aimed at Farragut and Farragut only; therefore, the legislative history only reinforces the Act's general, and not special, character.

Based on the above, we reverse the district court's finding that the Act was a special law that violated art. III, § 19 of the Idaho Constitution.

### D. The Act is not an unconstitutional deprivation of judicial power.

The other constitutional issue before this Court is whether the Act violates art. V, § 13 of the Idaho Constitution by depriving the judicial branch of its power. The district court held that the Act did so. The court's rationale was that the Legislature had attempted to "legislate itself" out of this case by passing the Act, and that based on precedent from *ISEEO IV*, the Act was unconstitutional. The district court further found that the Act was "simply not a valid exercise of the State's police power," because the Act's focus was not to protect public health, but to "insulate [IDFG] from liability."

IDFG argues that the Act is not a deprivation of judicial power, as the Legislature's police powers give it the authority to set noise standards for state-owned property, and that it is not an attempt to "regulate the courts in the exercise of their powers." IDFG further contends that an injunction is subject to "changes in law or circumstance," such as the Act's noise standards, and such a change is not a Legislative deprivation of judicial power. CARE's responds that "[the Act is] '. . . a special enactment designed only to affect one particular lawsuit . . .' in violation of separation of powers," and thus violative of art. V, § 13.

Article V, § 13 of the Idaho Constitution provides that, "[t]he legislature shall have no power to deprive the judicial department of any power or jurisdiction which rightly pertains to it as a coordinate department of the government." This Court most recently addressed legislative deprivation of power in *ISEEO IV*. There, an association of school superintendents and parents

---

**shooting ranges.** Rep. Eskridge explained that this bill **also** helps deal with the the litigation issue at Farragut State Park **and will help protect the State against similar litigation in the future.**

\*\*\*

Sharon Kiefer, representing [IDFG] stood to testify in favor of HB515. She reviewed the merits of this bill and related that [IDFG] has worked closely with the Attorney General's Office to address noise related issues raised in litigation at Farragut State Park **and future concerns at other ranges.**

brought suit against the State for not providing proper funding to Idaho public schools. *ISEEO IV*, 140 Idaho at 588, 97 P.3d at 455. The Legislature passed HB 403 as part of an effort to end that litigation. *Id.* at 589, 97 P.3d at 456. Among other things, HB 403 provided that the plaintiffs would have to sue school districts where underfunded, and thus unsafe, school buildings were located; that the venues for the suits would be changed to where those districts were found; and that, if the *ISEEO IV* plaintiffs did not refile their suits to comply with these procedures, their cases would be dismissed. *Id.* at 589–90, 97 P.3d at 456–57. This Court found that HB 403 was a deprivation of judicial power because it "directly contradict[ed] Idaho court procedure and effectively dismisse[d] parties to a pending lawsuit without any court action." *Id.* at 593, 97 P.3d at 460. HB 403 also altered the typical procedures by which courts could issue a stay of proceedings—another legislative attempt to "make decisions regarding this litigation that only the district court [could] make." *Id.* After questioning "whether the Legislature itself can say when a law altering procedural rules is necessary," and after weighing the State's interests in the suit, the *ISEEO IV* Court concluded:

> The State is attempting to end legislatively the ISEEO suit and effectively remove itself from any further responsibility or liability. Such a motive may be a necessity as viewed by the Legislature but, given the claims made by the school districts, it is not sufficiently necessary so as to justify rewriting the Court's rules of procedure.

*Id.* We held that because "there [was] no necessity . . . meriting the legislature's attempt to legislate itself out of this lawsuit by rewriting the Idaho Rules of Civil Procedure," HB 403 was an unconstitutional deprivation of judicial power. *Id*.

Just as courts have certain inherent powers that may not be infringed upon, so does the Legislature. It may, "under the broad concept of police power . . . enact laws concerning the health, safety and welfare of the people so long as the regulations are not arbitrary or unreasonable." *Van Orden v. State*, 102 Idaho 663, 667, 637 P.2d 1159, 1163 (1981). We find that a noise standard is a clear example of a law concerning the health and welfare of citizens. Indeed, the United States Supreme Court has held that "[c]ontrol of noise is of course deep-seated in the police power of the States." *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638, 93 S. Ct. 1854, 1862 (1973); *see also* 122 A.L.R. 5th 593 § 2[a] (2004) ("A municipality or state has the authority pursuant to its police powers to protect its citizens from unwelcome noise or sounds."). While "[t]here are . . . limits beyond which legislation cannot rightfully go," generally speaking, "every possible presumption is to be indulged in favor of the validity of a statute." *Ex parte Crane*, 27

Idaho 671, 682, 151 P. 1006, 1009 (1915).

The enactment of the Act and its noise standard was not a legislative deprivation of judicial power; rather, it was a valid use of the Legislature's police power. Unlike the *ISEEO IV* case, the Act had zero effect, directly or indirectly, on the Idaho Rules of Civil Procedure, or any other traditional province of the courts. Further, while the statute in *ISEEO IV* deprived judicial power by directly affecting the litigation at issue there, the Act does not have such an effect. The Act itself does not even refer to the Farragut Range or this litigation. And though the Act's legislative history does refer to Farragut and to this case, that history is peppered with similar references to other cases, and other ranges. Moreover, unlike the law in *ISEEO IV*, the Act does not dismiss IDFG from this case, or disrupt or effectively end this litigation in IDFG's favor, or stage an attempt to "effectively remove [the State] from any responsibility or liability." To the contrary, establishing a noise standard here—at any decibel level—would not end this litigation. This is because, as the district court noted, "noise . . . [is] not a factor" for lifting the 500-shooter component of the injunction. And, though noise is a factor of the 501-shooter component, it would take more than IDFG's compliance with regard to noise to lift that part of the injunction; per the terms of the 501-shooter component, IDFG would still need to address safety concerns. Put simply, although the Act does, at most, potentially make compliance with part of the injunction easier, it does not by itself lift the injunction, or "legislatively remove" IDFG from this lawsuit, or end IDFG's responsibility in this matter. Thus, the Act does not rise to the level of an *ISEEO IV*-like interference with the judiciary, and does not violate art. V, § 13 of the Idaho Constitution. We reverse the district court's holding to the contrary.

### E. The case must be remanded to the district court to determine IDFG's compliance with both the safety and noise requirements of the 501-shooter standard.

The district court denied IDFG's motion to lift the injunction with regard to the 501-shooter component, "due solely to the finding that the Idaho Outdoor Sport Shooting Range Act is unconstitutional, due to failure to address noise considerations alone." Therefore, the district court did not consider the safety and noise issues argued by the parties. The case must be remanded to the district court for consideration of those issues in conjunction with IDFG's Relief Motion for the 501-shooter component. In considering the noise aspect, the district court must apply the noise standards established in the Act.

15

**F. CARE is not entitled to attorney's fees.**

CARE argues that it is entitled to attorney's fees under I.C. § 12-117, which allows for attorney's fees for the prevailing party on appeal "in any proceeding involving as adverse parties a state agency or a political subdivision and a person," so long as "the nonprevailing party acted without a reasonable basis in fact or law." Here, because IDFG has prevailed on appeal, CARE is not awarded attorney's fees.

**IV.**
**CONCLUSION**

For the foregoing reasons, we: 1) reverse the district court's order holding that IDFG has not complied with the 500-shooter component of the injunction; 2) conclude as a matter of law that IDFG has complied with the 500-shooter component, and lift that component of the injunction; 3) reverse the district court's order holding the Act to be unconstitutional; 4) remand this case to the district court to determine whether IDFG has complied with the 501-shooter component of the injunction. IDFG is awarded its costs on appeal.

Chief Justice BURDICK, and Justices EISMANN, W. JONES, and HORTON CONCUR.

16