# IN THE SUPREME COURT OF THE STATE OF IDAHO

SNAP! MOBILE, INC., a Delaware corporation,

    Plaintiff-Respondent,

v.

VERTICAL RAISE, LLC, an Idaho limited liability company; and PAUL LANDERS, individually,

    Defendants-Appellants.

---

SNAP! MOBILE, INC., a Delaware corporation,

    Plaintiff-Appellant,

v.

VERTICAL RAISE, LLC, an Idaho limited liability company; and PAUL LANDERS, individually,

    Defendants-Respondents,

and

PAUL CROGHAN,

    Interested Party-Respondent.

Docket No. 49418

Boise, September 2023 Term

Opinion Filed: February 2, 2024

Melanie Gagnepain, Clerk

Docket No. 49483

---

Supreme Court Docket No. 49418

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County, John T. Mitchell, District Judge.

The judgment of the district court is <u>affirmed in part</u> and <u>reversed in part</u>.

Stoel Rives, LLP, Boise, for Appellants Vertical Raise, LLC, and Paul Landers. W. Christopher Pooser argued.

Lake City Law Group, PLLC, Coeur d'Alene, for Appellants Vertical Raise, LLC, and Paul Landers. Nathan Ohler appeared.

1

Duke Evett, PLLC, Boise, for Respondent Snap! Mobile, Inc. Keely E. Duke argued.

_____

Supreme Court Docket No. 49483

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County, Lamont C. Berecz, District Judge.

The judgment of the district court is <u>affirmed</u>.

Duke Evett, PLLC, Boise, for Appellant Snap! Mobile, Inc. Emma Nowacki argued.

Owens, McCrea & Linscott, PLLC, Coeur d'Alene, for Respondent Paul Croghan. April Linscott argued.

Bolton Law, PLLC, Coeur d'Alene, for Respondents Vertical Raise, LLC, and Paul Landers. K. Jill Bolton argued.

Lake City Law Group, PLLC, Coeur d'Alene, for Respondents Vertical Raise, LLC, and Paul Landers. Nathan Ohler appeared.

_____

BRODY, Justice.

This appeal concerns the modification of a jury's verdict and a challenge to an injunction on overbreadth grounds and for lack of specificity under Idaho Rule of Civil Procedure 65(d). There are two separate proceedings at issue involving many of the same participants but with two different district judges. The first proceeding (Supreme Court Docket Number 49418) involved a jury trial in which the district court (Judge John T. Mitchell or "trial court") granted an additur or a new trial following a jury's verdict. The second proceeding (Supreme Court Docket Number 49483) involved a challenge to contempt enforcement of a preliminary injunction which was originally issued by the trial court. However, the trial court later recused itself and the case was thereafter assigned to a different district court judge (Judge Lamont C. Berecz or "contempt court").

Snap! Mobile, Inc. ("Snap") and Vertical Raise, LLC ("Vertical Raise") are competing online fundraising companies that work with schools, clubs, and coaches to raise money through online donation campaigns. In 2019, Snap filed suit against Vertical Raise and its CEO Paul

2

Landers (collectively "VR/Landers"), alleging tortious interference with contract, misappropriation of trade secrets, and common law unfair competition. Snap alleged that VR/Landers poached its sales representatives and customers knowing that this would violate non-compete and confidentiality provisions contained in the former sales representatives' employment agreements with Snap.

The trial court granted Snap a preliminary injunction to enforce provisions of its employment agreements and also granted partial summary judgment in favor of Snap on liability for its tortious interference with contract and misappropriation of trade secrets claims. The damages issue proceeded to trial in which a jury awarded Snap $1,000,000. On Snap's post-trial motion, the trial court entered an additur increasing the jury's total award to $2,310,021 and gave VR/Landers the option of either accepting the additur or having a new trial. The trial court also entered a permanent injunction against VR/Landers.

While the trial court case was pending, before the trial took place, Snap alleged violations of the preliminary injunction and brought motions for contempt against VR/Landers and Paul Croghan ("Croghan"), an independent contractor for Vertical Raise. The trial court recused itself from the contempt matters after it recognized that it had committed a procedural error, and the contempt matters were then reassigned to the contempt court, which subsequently dismissed the contempt charges after concluding the terms of the preliminary injunction were vague and overbroad and could not be enforced.

On appeal, VR/Landers argues that the trial court erred in (1) granting the additur or new trial, (2) awarding discretionary costs to Snap for its expert witness fees, and (3) entering a permanent injunction against VR/Landers.

In a separate appeal which has been consolidated for purposes of this opinion, Snap contends that the contempt court erred in dismissing the contempt charges because VR/Landers and Croghan were procedurally barred from challenging the preliminary injunction in a collateral proceeding and because the injunction complied with the specificity requirements of Idaho Rule of Civil Procedure 65(d). We affirm the decisions of the trial court in part and reverse in part and remand this case for further proceedings. We affirm the decision of the contempt court.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Snap is an online software platform that works with schools, clubs, and nonprofit organizations to raise money through online donation campaigns. Since 2013, Snap compiled

3

financial, sales, and business data from its campaigns into a proprietary database, which it refers to as the Snap Database. In 2018, Snap's sales representatives signed agreements that included restrictive covenant provisions addressing confidentiality (Section 4.1), non-competition (Section 4.3), non-acceptance of business (Section 4.4), and non-solicitation (Section 4.5). Snap's Employment Agreement for sales representatives in California did not include a non-compete clause, but contained limitations on sales representatives' use of confidential, proprietary, and trade secret information.

Vertical Raise is a competing online fundraising company formed by Paul Landers. In 2018, Vertical Raise began recruiting Snap's sales representatives. When hiring former Snap employees, Vertical Raise knew that those employees had agreements with Snap and that the agreements included non-compete and/or confidentiality provisions. Vertical Raise also encouraged former Snap employees to target Snap's customers.

## A. Complaint and Preliminary Injunction

In December 2019, Snap filed suit against VR/Landers, alleging tortious interference with contract, misappropriation of trade secrets, various violations of unfair competition laws, and civil conspiracy. The trial court granted partial summary judgment to Snap on the issue of liability for its claims of tortious interference with contract and misappropriation of trade secrets.

The trial court also granted Snap's request for a preliminary injunction, stating that the "evidence provided shows that Vertical Raise has made a concerted effort to solicit and employ [Snap] employees, knowingly conflicting with those employees' valid contracts with [Snap]." The preliminary injunction prohibited Vertical Raise, Landers, and "anyone acting in concert or on behalf of" Vertical Raise from engaging in certain conduct, which included soliciting, transacting, or accepting business with former Snap customers or business partners or paying a sales representative for such activities. The order further prohibited VR/Landers from "aiding or abetting" the former Snap employees in breaching their employment contracts, recruiting Snap sales representatives, and "using Snap[]'s confidential, trade secret information including, without limitation, customer lists, compilations of customer information and/or pricing information." No exceptions were made for the California representatives, who were not subject to non-compete and non-solicitation covenants.

4

## B. Contempt Proceedings

Snap filed multiple motions to hold VR/Landers in contempt of court for alleged violations of the preliminary injunction order. Snap sought both civil and criminal sanctions. The trial court summarily granted the motions for criminal contempt without affording VR/Landers a jury trial and without charging or arraigning VR/Landers as required by Idaho Rule of Civil Procedure Rule 75. After recognizing its procedural error, the trial court rescinded its prior orders sanctioning VR/Landers for criminal contempt and then recused itself from presiding over further contempt proceedings in this case, which were reassigned to the contempt court.

Shortly before trial, Snap filed its fourth motion for contempt requesting $290,000 in fines against VR/Landers and 175 days of jail time against Landers. During the damages trial, Snap filed a separate motion for contempt requesting $80,000 in fines and 80 days of jail time against Paul Croghan, a non-party to this litigation. Croghan is a former employee of Snap who works as an independent contractor for Vertical Raise. Croghan lives and works exclusively in California. Snap alleged that Croghan was responsible for sixteen of the ninety-three violations of the preliminary injunction "by soliciting the business of, transacting business with, and accepting business from Snap[]'s Business Partners" who were located in California.

In August 2021, Croghan traveled to Idaho to testify on behalf of Vertical Raise. During a break in his testimony, the trial court, at Snap's request, directed the parties and Croghan into different courtrooms and had the bailiff serve Croghan with Snap's motion for contempt. The trial court stated, "[t]he record will reflect that Mr. Croghan has been served with those documents, and I do have concerns about my jurisdiction." After Croghan was served with the contempt motion, three Vertical Raise witnesses fled the courthouse without testifying or being served.

Croghan and VR/Landers subsequently filed motions before the contempt court to dismiss the charges of contempt, arguing that the preliminary injunction order was overbroad and vague. Croghan further argued that the trial court did not have personal jurisdiction over him due to alleged defects in Snap's service of process. In response, Snap argued that the preliminary injunction satisfied the specificity requirements of Idaho Rule of Civil Procedure 65(d) and the motions to dismiss were an "improper attempt to obtain appellate review" of the trial court's order granting injunctive relief. The contempt court granted the motions to dismiss, determining that the preliminary injunction order was vague, overbroad, and "patently unenforceable." The contempt court further determined that it lacked personal jurisdiction over Croghan because he was immune

5

from service of process while appearing as a witness to testify for Vertical Raise and because Idaho's long-arm statute did not provide jurisdiction.

### C. Damages Trial

The trial judge presided over an eight-day jury trial to determine damages. Both parties retained economic damages experts who provided competing valuations of Snap's damages. VR/Landers' expert Arik Van Zandt ("Van Zandt") calculated Snap's damages in the form of lost profits and testified that "lost profits" capture the economic benefit that Snap otherwise would have received from the former sales representatives. Van Zandt testified that Snap's lost profits ranged from $360,000 to $485,000 for former, non-California representatives, and $230,000 to $311,000 for former California representatives.

In contrast, Snap's expert, Harold Martin ("Martin"), calculated three types of damages: (1) lost profits; (2) unjust enrichment; and (3) cost of workforce damages. Martin explained that even though Snap had claims for tortious interference with contract, misappropriation of trade secrets, and unfair competition, Snap's damages were the same under each cause of action. Martin testified that lost profits "represent the profits that Snap lost as a result of Vertical Raise's and Mr. [Landers]'s hiring of the former Snap reps and solicitation of the former Snap clients in violation of the Snap sales agreement" and that unjust enrichment "is more or less the mirror image of lost profits, except it's looking at it from the perspective of what Vertical Raise gained by virtue of hiring the former Snap[] reps and soliciting their former clients[.]" Martin clarified that Snap could not recover both lost profits and unjust enrichment damages.

Martin opined that unjust enrichment damages, with prejudgment interest, ranged from $960,021 under "Scenario One" to $1,065,179 under "Scenario Two." Scenario One represented Martin's estimate of damages "where the former [Snap representative] had a prior relationship with the former Snap[] client while that [representative] worked at Snap[]." Scenario Two "expanded" on Scenario One by adding Martin's estimate of damages "where the former Snap[] representative did not have a relationship with a former Snap[] client while they worked at Snap[], but later, when that rep left Snap[] and joined VR, they solicited that client[.]"

**"Scenario 1."**

| Indicated value | Unjust Enrichment | | Prejudgement [sic] Interest | | Total |
|---|---|---|---|---|---|
| Former Snap Reps – Sales Reps (Excl. California) | $355,656 | (1) | $57,526 | (2) | $413,182 |
| Former Snap Reps – California Sales Reps | 258,533 | (1) | 64,284 | (2) | 322,817 |
| Total – Former Snap Reps | 614,189 | | 121,810 | | 735,999 |
| VR Reps (not affiliated with Snap) | 126,932 | (1) | 26,663 | (2) | 153,595 |
| Total indicated value | $741,121 | | $148,473 | | $889,594 |

*Scenario 1 – Period 1*

| Indicated value | Unjust Enrichment | | Prejudgement [sic] Interest | | Total |
|---|---|---|---|---|---|
| Former Snap Reps – Sales Reps (Excl. California) | $64,158 | (1) | $6,269 | (2) | $70,427 |
| Total indicated value | $64,158 | | $6,269 | | $70,427 |

*Scenario 1 - Period 2*

Thus, under Scenario 1, Martin opined that Snap was entitled to $805,279 ($741,121 + $64,158) for unjust enrichment damages, plus $154,742 ($148,473 + $6,269) in prejudgment interest, for a total of $960,021.

**"Scenario 2."**

| Indicated value | Unjust Enrichment | | Prejudgement [sic] Interest | | Total |
|---|---|---|---|---|---|
| Former Snap Reps – Sales Reps (Excl. California) | $391,146 | (1) | $63,322 | (2) | $454,468 |
| Former Snap Reps – California Sales Reps | 296,202 | (1) | 72,865 | (2) | 369,067 |
| Total – Former Snap Reps | 687,348 | | 136,187 | | 823,535 |
| VR Reps (not affiliated with Snap) | 133,618 | (1) | 27,719 | (2) | 161,337 |
| Total indicated value | $820,967 | | $163,906 | | $984,872 |

*Scenario 2 - Period 1*

| Indicated value | Unjust Enrichment | | Prejudgement [sic] Interest | | Total |
|---|---|---|---|---|---|
| Former Snap Reps – Sales Reps (Excl. California) | $73,319 | (1) | $6,987 | (2) | $80,306 |
| Total indicated value | $73,319 | | $6,987 | | $80,306 |

*Scenario 2 - Period 2*

7

Under Scenario 2, Martin opined that Snap was entitled to $894,286 ($820,967 + $73,319) for unjust enrichment damages, plus $170,893 ($163,906 + $6,987) in prejudgment interest, for a total of $1,065,178.

Martin further testified that "regardless of which form the jury decides in terms of damages," Snap would also be entitled to $1,017,054 for the cost of assembled workforce and $182,383 in prejudgment interest, for a total of $1,199,437 in workforce replacement damages. Martin defined cost of workforce as "the amount that Snap[] invested in both recruiting and training of the former Snap[] reps who then ultimately left to join Vertical Raise" and that replacement costs were "part and parcel of the definition of the cost of the assembled work force." Martin calculated the "cost of assembled workforce" by adding the costs associated with recruitment, training, human resource costs, and administrative costs for each former Snap sales representative who left to join Vertical Raise. However, the jury instruction defining cost of workforce stated:

> The cost of workforce [Snap] suffered to replace its Sales Representatives is the investment [Snap] more likely than not incurred to recruit, hire, and train *new* Sales Representatives to replace Sales Representatives who became Sales Representatives for Vertical Raise.

(Emphasis added).

Despite Martin's testimony that Snap's economic damages were the same under each cause of action, the special verdict form tasked the jury to separately determine the "type and amount of damages" specific to each of Snap's claims. The jury returned verdicts awarding Snap $750,000 in unjust enrichment damages and $250,000 in punitive damages for a total award of $1,000,000:

(1) For Tortious Interference with Contract:
    Lost Profits:                 $ 0
    Cost of Workforce       $ 0
    Unjust Enrichment       $550,000
(2) For Misappropriation of Trade Secrets:
    Lost Profits:                 $ 0
    Cost of Workforce       $ 0
    Unjust Enrichment       $ 0
(3) For Unfair Competition:
    Lost Profits:                 $ 0
    Cost of Workforce       $ 0
    Unjust Enrichment       $200,000
(4) For Punitive Damages:
    Vertical Raise:             $150,000
    Paul Landers:              $100,000

8

The trial court subsequently issued a permanent injunction against VR/Landers, which had identical terms to the preliminary injunction, except that the duration of the permanent injunction spans 18 months after the entry of judgment. The district court also granted Snap $33,174.27 in costs as the prevailing party and $238,629 in discretionary costs for Martin's expert witness fees.

**D. Additur or New Trial**

Dissatisfied with the jury's verdict, Snap subsequently sought an additur to increase the jury's award for its tortious interference with contract claim. Snap contended that the jury had disregarded Martin's testimony and the jury's award was a product of passion and prejudice caused by VR/Landers' multiple violations of the trial court's order on motions in limine. The trial court granted Snap's request from the bench and entered an additur increasing the jury's total award from $1,000,000 to $2,310,021.

In addressing Snap's motion for additur, the trial court separately analyzed the jury's verdicts on unjust enrichment damages and cost of workforce damages. On unjust enrichment damages, the trial court found that Martin's testimony at trial was credible and uncontradicted. The trial court further determined that Van Zandt did not contradict Martin's testimony on unjust enrichment damages because his testimony only addressed lost profits. On this basis, the trial court held that the jury's award was against the "clear weight of the evidence," noting that "the jury did find unjust enrichment damages . . . but gave them in an amount that was less than the uncontradicted evidence for unjust enrichment damages." Therefore, the trial court granted an additur of "$410,021 to get unjust enrichment up to $960,021." However, the trial court further stated that it would not award prejudgment interest because the damages were not liquidated:

> I am not awarding the alternative amount . . . that would include prejudgment interest. I wasn't persuaded at trial that these were liquidated damages under [Idaho Code § 28-22-104], and I'm still not, and so I'm not willing to award the higher amount that would include prejudgment interest, and the basis for that ruling granting the additur is that the -- the testimony of Martin on that issue, on an unjust enrichment was uncontradicted.

On cost of workforce damages, the trial court further determined that Martin's testimony at trial was credible and uncontradicted, "other than vague criticism by Van Zandt that shouldn't have come in." The trial court further determined that "there's no other explanation for [the] amount reached by the jury other than passion or prejudice due to the defendants' disregard of this [c]ourt's orders on motions in limine and expert witness disclosure." However, the trial court

9

indicated that it was unwilling "to give the entire $1,199,437 that Martin testified to" and instead entered an additur increasing the jury's award from $0 to $900,000.

Following the oral ruling, the trial court directed Snap's counsel to "prepare an order to that effect." However, instead of submitting a proposed order conditionally granting a new trial subject to an additur, Snap submitted an "Amended Judgment," which awarded Snap the additur without VR/Landers being consulted or being given the option of accepting the additur in lieu of a new trial. The amended judgment was signed and entered by the trial court. VR/Landers have not accepted the additur or requested a new trial.

## II.    STANDARDS OF REVIEW

### A.  Additur or New Trial

"The decision by a trial court to grant or deny a motion for a new trial rests within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of a clear and manifest abuse of discretion." *McCandless v. Pease*, 166 Idaho 865, 872, 465 P.3d 1104, 1111 (2020) (citation omitted). "Moreover, '[a] trial court's grant of additur is reviewed for abuse of discretion.' " *Id.* (quoting *Ellefson v. Palmer*, 162 Idaho 393, 398, 397 P.3d 1152, 1157 (2017)). "If the district court decides to [increase] the amount of a jury award, it must enter detailed findings of fact and conclusions of law explaining its reasoning and the basis" for the additur. *Litke v. Munkhoff*, 163 Idaho 627, 636, 417 P.3d 224, 233 (2018); *see* I.C. § 6-807(2).

Under the abuse of discretion standard, this Court conducts a four-part inquiry to determine whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

### B.  Overbreadth and Specificity under Idaho Rule of Civil Procedure 65(d)

"An injunction is an equitable remedy[,]" *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017), and "[a] district court's decision granting injunctive relief is reviewed for an abuse of discretion." *Hood v. Poorman*, 171 Idaho 176, 519 P.3d 769, 786 (2022) (citing *Gem State Roofing, Inc. v. United Components, Inc.*, 168 Idaho 820, 828, 488 P.3d 488, 496 (2021)). "Although a district court has 'a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct,' it is nonetheless 'the essence of equity jurisdiction' that a court is empowered 'to grant relief no broader than necessary to cure the effects

of the harm caused by the violation.' " *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (quoting *Forschner Grp., Inc. v. Arrow Trading Co.,* 124 F.3d 402, 406 (2d Cir.1997)). "[A]n overbroad injunction is an abuse of discretion." *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 760 (9th Cir. 2020) (quoting *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018)).

For an injunction issued under Idaho Rule of Civil Procedure 65(d), "[a] district court's interpretation of its own order is generally reviewed for abuse of discretion." *Citizens Against Range Expansion v. Idaho Fish And Game Dep't*, 153 Idaho 630, 634, 289 P.3d 32, 36 (2012) (quoting *Garcia v. Yonkers Sch. Dist.,* 561 F.3d 97, 103 (2d Cir.2009)). Nonetheless, we will not "give equal deference to every aspect of a court's decision." *Garcia*, 561 F.3d at 103. "The abuse of discretion standard is used to evaluate the . . . court's application of the facts to the appropriate legal standard, and the factual findings and legal conclusions underlying such decisions are evaluated under the clearly erroneous and *de novo* standards, respectively." *Id*. (citation omitted). "Accordingly, we review *de novo* the legal question of whether the district court issued a preliminary injunction or restraining order in satisfaction" of Rule 65. *Id.* (citation omitted); *see also Premier Commc'ns Network, Inc. v. Fuentes*, 880 F.2d 1096, 1100 (9th Cir. 1989) (citation omitted) ("[C]hallenges to an injunction on specificity grounds . . . are reviewed de novo."); *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 143 (2d Cir. 2011) ("We review *de novo* whether the injunctions comply with Rule 65(d)."). This standard is consistent with the standard of review for determining whether a court order is ambiguous. *See Vierstra v. Vierstra*, 153 Idaho 873, 880, 292 P.3d 264, 271 (2012) ("Whether a court order is ambiguous is a question of law" and "[i]nterpretation of an unambiguous court order is also a question of law.").

Our case law does not address the standards for reviewing a separate court's order dismissing charges of contempt on the grounds that the underlying injunction failed to meet the specificity requirements of Idaho Rule of Civil Procedure 65(d), or that the injunction issued was overly broad. However, as each conclusion reached by the contempt court resolved legal questions, not factual disputes, we review the contempt court's order de novo. *See Rowley v. Ada Cnty. Highway Dist.*, 156 Idaho 275, 277, 322 P.3d 1008, 1010 (2014) ("We review a district court's conclusions of law de novo.").

11

### III.   ANALYSIS

**A. The trial court abused its discretion in granting Snap an additur because the jury's award is not solely attributable to passion or prejudice.**

VR/Landers appeal the trial court's order granting an additur that increased the jury's total award from $1,000,000 to $2,310,021 and request this Court to reinstate the jury's original verdict, or alternatively, allow VR/Landers to elect to have a new trial. VR/Landers contend that the trial court abused its discretion in granting the additur by: (1) failing to consider possible justifications for the jury's award of damages other than passion or prejudice; and (2) considering attorney misconduct as a basis for awarding an additur under Idaho Rule of Civil Procedure 59(a)(1)(F). We agree with VR/Landers and remand this matter with instructions to reinstate the jury's verdict of $1,000,000.

Rule 59(a)(1)(F) permits a court to order a new trial due to "excessive damages or inadequate damages, where the jury's determination of damages appears to have resulted from passion or prejudice." I.R.C.P. 59(a)(1)(F). Under Rule 59.1, a court may conditionally grant a new trial subject to either an additur or a remittitur. I.R.C.P. 59.1(a). An additur is "[a] trial court's order . . . that increases the jury's award of damages to avoid a new trial on grounds of inadequate damages." *McCandless*, 166 Idaho at 879, 465 P.3d at 1118 (2020) (quoting *Additur*, BLACK'S LAW DICTIONARY (11th ed. 2019)). The decision to grant an additur "is a highly discretionary decision that, first, requires the trial court to determine whether to grant a new trial based on an [inadequate] award of damages" under Idaho Rule of Civil Procedure 59(a)(1)(F). *SRM Arms, Inc. v. GSA Direct, LLC*, 169 Idaho 196, 202, 494 P.3d 744, 750 (2021) (discussing remittitur).

Our review of a trial court's order granting a new trial "primarily focuses on the process by which the [trial] court reached its decision, not on the result of the [trial] court's decision." *Id.* at 203, 494 P.3d at 751 (quoting *Sheridan v. St. Luke's Reg'l Med. Ctr.*, 135 Idaho 775, 780, 25 P.3d 88, 93 (2001)). The process for determining whether passion or prejudice influenced a jury's determination of damages under Rule 59(a)(1)(F) involves three steps: first, the trial court "*must* weigh the evidence" and calculate the award it would have imposed if it had sat as the trier of fact. *Id.* at 202, 494 P.3d at 750 (citation omitted) (emphasis in original). Second, the trial judge must "compare the jury's award to what he would have given had there been no jury." *Id*. Third, if there is a great disparity between the two damage awards, then the trial court must determine whether the disparity can be "explained away as simply the product of two separate entities valuing the

12

proof of the plaintiff['] s injuries in two equally fair ways." *McCandless*, 166 Idaho at 875, 465 P.3d at 1114 (quoting *Quick v. Crane,* 111 Idaho 759, 769, 727 P.2d 1187, 1197 (1986)).

"[I]f a trial court's calculated damages award is substantially different from the jury's award, and the trial court cannot attribute the jury's award to an equally fair alternative interpretation of the facts—i.e. the trial court determines the jury's award could only be due to passion or prejudice—then the trial court may order" an additur or new trial for damages. *SRM Arms, Inc.*, 169 Idaho at 203, 494 P.3d at 751. However, "respect for the collective wisdom of the jury and the function entrusted to it under our constitution suggests the trial judge should, in most cases, accept the jury's findings even though he may have doubts about some of their conclusions." *Quick*, 111 Idaho at 768, 727 P.2d at 1196. "[M]ere disagreement with the jury's verdict is not enough for a trial court to override it; the court must determine that the jury's verdict is such a great departure from the clear evidence at trial that the court's differing view is more than just a fair difference of opinion." *McCandless*, 166 Idaho at 875, 465 P.3d at 1114. "[I]n order for us to uphold the [trial] court's [increased] damages award, the record must make clear the jury could not have arrived at its award except by passion or prejudice." *SRM Arms, Inc.*, 169 Idaho at 205, 494 P.3d at 753.

On appeal, we must determine whether the trial court erred in finding that the jury's tortious interference with contract award was solely attributable to passion or prejudice. "[W]e must first determine whether the [trial] court properly divined the jury's reasoning, and then second, whether the [trial] court abused its discretion in responding to that reasoning." *Id.* at 203, 494 P.3d at 751. For the reasons set forth below, we determine that the trial court failed to "reach its decision by the exercise of reason" because the jury's award of unjust enrichment and cost of workforce damages cannot be solely attributable to passion or prejudice. *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194.

*1. The jury's failure to award the cost of workforce damages may be attributed to the jury instructions.*

The trial court determined that (1) the jury's failure to award Snap any damages for the cost of workforce went against the "clear weight of the evidence," and (2) there was "no other explanation for an amount reached by the jury other than passion or prejudice due to the defendants' disregard of this [c]ourt's orders on motions in limine and expert witness disclosure":

I am going to grant an additur to work force replacement damage in the amount of $900,000, again, finding that that testimony, that category of damage really came

13

in in [sic] an uncontradicted fashion. Any contradiction by Van Zandt and by defense counsel, which isn't evidence but I think that that is what caused passion or prejudice in the jury not awarding anything for this when it was uncontradicted, so $900,000 for that category.

. . .

I have read all the submissions on this issue, and I did not see any inaccuracies by the plaintiff as far as claims where this [c]ourt's motions in limine rulings were violated. I found that [Snap's counsel] was accurate in that. My decision isn't -- and so I am finding passion or prejudice by the defendant in violating this [c]ourt's orders on the motions in limine and on expert witness disclosure limitations . . . More importantly, in this [c]ourt's estimation, it's the fact that Martin's evidence was uncontradicted, and that puts us back to the clear weight of the evidence standard, not even . . . needing to reach the passion or prejudice, but I do find that the – there's no other explanation for an amount reached by the jury other than passion or prejudice due to the defendants' disregard of this [c]ourt's orders on motions in limine and expert witness disclosure, but preliminarily, again, it's due to the jury's finding being against the clear weight of the evidence.

This Court has acknowledged "the difficult challenge a trial court faces when attempting to reverse engineer a jury's verdict," especially in complex cases with multiple variables. *SRM Arms, Inc.*, 169 Idaho at 206, 494 P.3d at 754. "Nevertheless, in order for us to uphold the [trial] court's [increased] damages award, the record must make clear the jury could not have arrived at its award except by passion or prejudice." *Id.* at 205, 494 P.3d at 753. This is not the case here.

We conclude that the jury's failure to award workforce damages can be attributed to the jury instructions' definition of workforce replacement damages as well as the jury's discretion not to be bound by any expert's opinion. Instruction 15b explained that workforce replacement damages were costs "*incurred* to recruit, hire, and train *new* Sales Representatives to replace Sales Representatives who became Sales Representatives for Vertical Raise." (Emphasis added.) However, Martin testified that cost of workforce damages represented "the amount that Snap[] *invested in* both recruiting and training of *the former* Snap [representatives] who then ultimately left to join Vertical Raise." (Emphasis added.) While Martin later testified that cost of workforce damages represented the "cost of replacing the person that leaves," his calculation of damage to Snap only considered the costs associated with onboarding the former Snap sales representative. In other words, Snap did not present evidence concerning the costs associated with onboarding "*new* Sales Representatives to replace Sales Representatives who became Sales Representatives for Vertical Raise." Instead, Snap only presented evidence of its lost investment in its former representatives. Moreover, because Snap did not provide any evidence on the number of new

14

employees it actually had to hire due to former representatives going to work for Vertical Raise or the actual cost incurred in onboarding any new employees to replace the former representatives, the jury's decision to decline to award cost of workforce damages is subject to "an equally fair alternative interpretation of the facts." *Id.* at 203, 494 P.3d at 751.

Next, Instruction 4b instructed the jury that it is not bound by an expert's opinion, and it may give such testimony any weight it deems it is entitled. Without being unduly influenced by passion or prejudice, the jury could have determined the other damages awarded were sufficient to compensate Snap. Snap cannot prevent employees from leaving its employment; it can only enforce its covenants not to compete or share confidential information. The jury could have weighed all the testimony and determined replacing employees is simply a cost of doing business or that Snap did not incur expenses to train new employees because there was no testimony to that effect during trial. Therefore, the district court failed to reach its decision to increase the jury's award by the exercise of reason by assuming the workforce damages were based solely on passion or prejudice.

   *2. The trial court erred in evaluating the jury's unjust enrichment award.*

As stated above, our review of a trial court's order on whether to grant a new trial "primarily focuses on the process by which the [trial] court reached its decision, not on the result of the [trial] court's decision.'" *SRM Arms, Inc.*, 169 Idaho at 203, 494 P.3d at 751 (quoting *Sheridan*, 135 Idaho at 780, 25 P.3d at 93). Under the first step, the trial court "*must* weigh the evidence" and calculate the award it would have imposed if it sat as the trier of fact." *Id.* at 202, 494 P.3d at 750 (citation omitted) (emphasis in original). While the trial court completed this step as required, the trial court's calculation of the damages it would have awarded as the trier of fact did not follow from its findings. Based on its additur award, it can be inferred that the trial court would have awarded $960,021 in unjust enrichment damages. Yet, when addressing unjust enrichment damages, the trial court stated it was not awarding prejudgment interest because the damages were not liquidated:

> I am not awarding the alternative amount . . . that would include prejudgment interest. I wasn't persuaded at trial that these were liquidated damages under [Idaho Code § 28-22-104], and I'm still not, and so I'm not willing to award the higher amount that would include prejudgment interest . . . .

It is unclear what the trial court was referring to when it stated that it would not award the "alternative amount" or "higher amount that would include prejudgment interest" because the

15

alternative calculations presented to the jury by Martin (Scenario One and Scenario Two) both included prejudgment interest. While an additur award of $960,021 is consistent with Martin's calculation of unjust enrichment damages with prejudgment interest included under "Scenario One," the trial court determined that Snap was not entitled to prejudgment interest. Thus, the trial court's calculation of unjust enrichment damages should have been reduced by $154,742, leaving a remainder of $805,279.

Under the second step, the trial court erred by comparing its increased award ($960,021) with an inaccurate assessment of the jury's award for unjust enrichment damages ($550,000), leaving a disparity of $410,021. While the jury's verdict on the tortious interference with contract claim awarded Snap $550,000 for unjust enrichment damages, the trial court failed to consider Martin's testimony that, collectively, there was only *one* damage amount available for Snap's tortious interference with contract, misappropriation of trade secrets, and unfair competition claims, which ranged from $960,021 under Scenario One and $1,065,179 under Scenario Two. In other words, in evaluating the jury's award for unjust enrichment damages, the trial court needed to assess the *combined* unjust enrichment awards for each of Snap's claims.

Here, the jury awarded Snap $550,000 in unjust enrichment damages for its tortious interference with contract claim *and* $200,000 in unjust enrichment damages for its unfair competition claim, for a total award of $750,000 in unjust enrichment damages. While Martin testified that his calculations of damages under each claim were not commutative and were not to be added together, the special verdict form asked the jury to *separately* determine the "type and amount of damages" for each of Snap's claims, which it did. Furthermore, we do not read Martin's testimony to stand for the proposition that Snap was only to be awarded the jury's highest unjust enrichment or lost profit award under the separate sections of the special verdict form. Instead, Martin was clarifying that his calculation of damages, $960,021 under Scenario One or $1,065,179 under Scenario Two, was not to be awarded under each of Snap's claims, but instead represented the total amount of Snap's economic damages. Therefore, under the second step, the trial court should have compared its calculation of unjust enrichment damages ($805,279) against the jury's total award for unjust enrichment damages ($750,000), leaving a significantly lower disparity of $55,279.

Under the third step, the trial court needed to determine whether the disparity of $55,279 could be "explained away as simply the product of two separate entities valuing the proof of the

16

plaintiff[']s injuries in two equally fair ways." *McCandless*, 166 Idaho at 875, 465 P.3d at 1114 (quoting *Quick,* 111 Idaho at 769, 727 P.2d at 1197). We determine that it can.

The trial court granted an additur on unjust enrichment, in part, because it determined Martin's testimony on unjust enrichment damages was uncontradicted as Van Zandt opined only on Snap's damages in the form of lost profits and not unjust enrichment. While "[a] trier of fact may not arbitrarily disregard credible and unimpeached testimony of a witness," this does not mean that a jury is required to render an award that directly aligns with an expert's calculation of damages if the evidence is contradicted or improbable. *Papin v. Papin*, 166 Idaho 9, 22, 454 P.3d 1092, 1119 (2019) (quoting *Wood v. Hoglund*, 131 Idaho 700, 703, 963 P.2d 383, 386 (1998)).

We have acknowledged that a trial judge's determination to discount the testimony of an expert witness was a proper exercise of his discretion in weighing the evidence. *See Ellefson*, 162 Idaho at 398, 397 P.3d at 1157. Under this step, however, the trial court did not consider how Van Zandt's testimony may have impacted the jury's award. During trial, the jury heard from Van Zandt that "lost profits capture the economic benefit that Snap[] otherwise would've received from those sales representatives." Martin further testified that unjust enrichment "is more or less the mirror image of lost profits, except it's looking at it from the perspective of what Vertical Raise gained by virtue of hiring the former Snap[] reps and soliciting their former clients[.]" Based on this testimony, a reasonable jury could have compared the competing calculations of Snap's economic damages, which, in turn, informed their award on unjust enrichment damages.

In addition, jurors can apply their own common sense and general knowledge in evaluating the evidence:

> [I]n appraising evidence before them, "jurors have the right to apply their own common sense and to use the general knowledge they have in common with the rest of mankind." *Fouche v. Chrysler Motors Corp.*, 107 Idaho 701, 704, 692 P.2d 345, 348 (1984) (quoting *Noland v. Sears, Roebuck & Co.*, 207 Kan. 72, 483 P.2d 1029, 1033 (1971)); see also I.C.J.I. 1.00 ("In your everyday affairs, you determine for yourselves whom you believe, what you believe and how much weight you attach to what you are told. The considerations you use in making the more important decisions in your everyday dealings are the same considerations you should apply in your deliberations in this case.").

*McCandless*, 166 Idaho at 875–76, 465 P.3d at 1114–15. Here, the jury was presented with conflicting calculations of Snap's economic damages by the parties' experts at trial and the jury's damages award fell within the range of those competing calculations. On this basis, the disparity

between the jury's award and the trial court's award can be explained away as simply the product of two separate entities valuing the proof of Snap's injuries in two equally fair ways.

Furthermore, we hold that the trial court did not act "consistently with the legal standards applicable" to granting a new trial subject to additur under Rule 59(a)(1)(F) by considering attorney misconduct as a basis to find passion or prejudice. *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194. While attorney misconduct may form the basis for granting a new trial under Rule 59(a)(1)(A) for "irregularity in the proceedings of the court, jury, or adverse party[,]"a trial court may *only* grant a new trial subject to additur under Rule 59(a)(1)(F) based on the inadequacy of damages, appearing to have been given under the influence of passion or prejudice. *See Quick*, 111 Idaho at 770 n.2, 727 P.2d at 1198 n.2 ("It is obvious that since a remittitur of damages arises only out of a new trial motion based on the excessiveness of damages . . . a remittitur cannot be based on any of the other grounds for a new trial enumerated under I.R.C.P. 59(a)."). To determine whether a jury's award of damages was influenced by passion or prejudice, the trial court must follow the three-step process as set forth above.

In short, we conclude that the trial court erred in determining that the jury's awards were solely attributable to passion or prejudice. Therefore, we reverse the trial court's order granting an additur or new trial and remand with instructions to reinstate the jury's original verdict.

**B. The trial court did not abuse its discretion in awarding Snap discretionary costs.**

VR/Landers assert that the trial court abused its discretion in awarding Snap $238,629 in discretionary costs for Martin's expert witness fees. A trial court may award discretionary costs "upon a showing that said costs were necessary and exceptional costs reasonably incurred, and should in the interest of justice be assessed against the adverse party." I.R.C.P. 54(d)(1)(D). The trial court must make express findings explaining why a discretionary cost should or should not be allowed. *Valiant Idaho, LLC v. N. Idaho Resorts, LLC*, 164 Idaho 222, 230, 428 P.3d 800, 808 (2018). This Court has explained that a trial court should assess the context and nature of a case as a whole to determine whether a particular expense is exceptional:

> [N]umerous complaints, depositions and expert testimony does not render a case in and of itself exceptional. Rather, courts should assess the context and nature of a case as a whole along with multiple circumstances. The mere fact numerous experts were retained or numerous amendments were filed does not standing alone render a case exceptional. Particular standards a court should consider include, but are not limited to, whether there was unnecessary duplication of work, whether there was an unnecessary waste of time, the frivolity of issues presented, and creation of

18

unnecessary costs that could have been easily avoided. Most importantly, however, a court should explain why the circumstances of a case render it exceptional.

*Id.* (quoting *Hoagland v. Ada Cnty.*, 154 Idaho 900, 914, 303 P.3d 587, 601 (2013)). "The party opposing an award of discretionary costs bears the burden of demonstrating that the district court abused its discretion." *Puckett v. Verska*, 144 Idaho 161, 169, 158 P.3d 937, 945 (2007).

VR/Landers has not demonstrated that the district court abused its discretion in awarding discretionary costs to Snap. VR/Landers cite *Nightengale v. Timmel* to support the proposition that the trial court erred in finding that the costs were exceptional merely because they were necessary. 151 Idaho 347, 354, 256 P.3d 755, 762 (2011) (abrogated by *State v. Cox*, 169 Idaho 14, 490 P.3d 14 (2021)). However, the facts of *Nightengale* are distinguishable from this case. In *Nightengale*, a district court granted discretionary costs for an expert's witness fees because the case required expert testimony regarding the vascular system and such experts had to travel to testify. *Id.* at 355, 256 P.3d at 763. Because expert testimony is required in every medical malpractice case under Idaho Code section 6–1012, we held that expert witness fees in these cases are generally considered ordinary—not exceptional. *Id.* Absent other findings, there was "no basis for every expert witness' testimony to be considered 'exceptional' simply because it requires specialized knowledge." *Id.*

Unlike the district court in *Nightengale*, the trial court here did not find that Martin's witness fees were per se exceptional because Snap's claims required expert testimony. Instead, the trial court based its decision to award discretionary costs on the unique "data-extreme" features of this case, which the trial court found to be exceptional. The trial court stated:

> [I]n this case I don't know how the case could've been pursued without an expert, so I do find that Mr. Martin's testimony was an extraordinary – an extraordinary expense. Sorting through the material, I'm certain [it] took the amount of time that Mr. Martin claimed that it did. I just can't imagine how obviously data-sensitive and data-extreme this case is, and I think that's really what makes it extraordinary.

The trial court further differentiated ordinary cases that require expert medical testimony and the data-intensive nature of this case that rendered Martin's testimony extraordinary:

> In the [medical malpractice] scenario a doctor or even an expert, you know, his testimony could come on in a half a day and really not take a lot of time in preparation compared to what Mr. Martin had to do in this case to make it even remotely digestible to a jury. I mean, this – the other option would really be to have this be a two-month-long trial, and so I do find his expenses to be extraordinary, and I don't find anything in the amounts requested for him to be inappropriate. I find them to be appropriate.

VR/Landers further cite to *Hoagland*, 154 Idaho at 914, 303 P.3d at 601, and *Valiant Idaho,* 164 Idaho at 232, 428 P.3d at 810, to support the proposition that "the fact that a case is complex does not make it exceptional." However, *Hoagland* and *Valiant Idaho* do not sweep as broadly as VR/Landers suggest and the facts are distinguishable. The main takeaway from *Hoagland* and *Valiant Idaho, LLC*, is that a court must adequately explain *why* the circumstances of a case render it exceptional; we did not hold that a court could not consider unique factors of a case, including its complexity, in determining whether it was exceptional. Furthermore, we have previously affirmed an award of discretionary costs on this same basis. *See Puckett*, 144 Idaho at 169, 158 P.3d at 945) (affirming an award of discretionary cost where the district considered the "exceptionality of the costs in light of the 'long course of litigation and complexity' " of the case).

In short, the trial court acted within the bounds of its discretion in granting Snap discretionary costs because the trial court made express findings that the unique circumstances of the case rendered the costs exceptional, and the record supports the trial court's determination. Therefore, the trial court's award of discretionary costs is affirmed.

**C. The contempt court did not err in dismissing the charges of contempt.**

The contempt court dismissed Snap's ninety-three charges of contempt against VR/Landers and Croghan, holding that the preliminary injunction order was impermissibly vague, overbroad, and "patently unenforceable." The contempt court further determined that it lacked personal jurisdiction over Croghan because Snap failed to properly serve Croghan and that it also lacked personal jurisdiction over Croghan under the long-arm statute. On appeal, Snap challenges the contempt court's dismissal on several bases. First, Snap contends that VR/Landers and Croghan were procedurally barred from challenging the enforceability of the preliminary injunction in the contempt proceedings under the collateral bar rule and the doctrine of res judicata. Second, Snap argues that the preliminary injunction was not vague and complied with the specificity requirements of Idaho Rule of Civil Procedure 65(d). Finally, Snap contends that service on Croghan was proper.

For the reasons set forth below, we hold that (1) VR/Landers and Croghan were not procedurally barred from challenging the enforceability of the preliminary injunction in the contempt proceedings; (2) the preliminary injunction complied with the specificity requirements of Rule 65(d); and (3) the preliminary injunction was overly broad and unenforceable. Each conclusion is addressed in turn.

20

*1. VR/Landers and Croghan were not barred from challenging the enforceability of the preliminary injunction under the collateral bar rule or res judicata.*

Snap contends that VR/Landers and Croghan were procedurally barred from challenging the enforceability of the preliminary injunction before the contempt court under the doctrine of res judicata and the "collateral bar rule." Before addressing the merits of Snap's arguments, it is important to discuss the application of the collateral bar rule. "In brief, the collateral bar rule permits a judicial order to be enforced through criminal contempt even though the underlying decision may be incorrect and even unconstitutional." *In re Establishment Inspection of Hern Iron Works, Inc.*, 881 F.2d 722, 725–26 (9th Cir. 1989) (citation omitted). Put differently, a "contemnor cannot ordinarily raise the invalidity of the judicial order as a defense to a contempt charge." *Id*. This rule stems from the premise "that a smoothly functioning judicial process may be jeopardized if parties are able to determine for themselves when and how to obey court orders." *Id*.

While this Court has not used the term "collateral bar rule" in a reported decision, we have recognized the principle that a contemnor may not challenge the merits of the underlying injunction as a defense to contempt charges. *See Mathison v. Felton*, 90 Idaho 87, 94, 408 P.2d 457, 461 (1965) (stating that "[e]ven though the judgment in this case which formed the basis for this contempt proceeding has been reversed, it is our conclusion that such reversal will be of no avail to the petitioner here in the determination of whether the contempt judgment should be upheld"); *see also Jim & Maryann Plane Fam. Tr. v. Skinner*, 157 Idaho 927, 933, 342 P.3d 639, 645 (2015) (citation omitted) ("Generally, 'final judgments, *whether right or wrong,* are not subject to collateral attack.' "); *In re Weick*, 142 Idaho 275, 278, 127 P.3d 178, 181 (2005) ("When a court has jurisdiction over the suit and the parties before it, its orders are to be obeyed until they are set aside by appropriate proceedings.").

The Idaho Court of Appeals has likewise made it clear that a contemnor may not ignore a court order even though he believes it to be incorrect:

> [T]he contemnor may challenge the procedure by which the contempt is adjudicated. He may argue that there is no substantial evidence to support the finding that he knowingly violated a court order. He may even challenge the penalties imposed. However, he may not knowingly ignore an order of the court, even though he believes it to be incorrect, and then contest the validity of the underlying order on appeal from a finding of criminal contempt.

*In re Contempt of Reeves*, 112 Idaho 574, 579, 733 P.2d 795, 800 (Ct. App. 1987).

There are, of course, exceptions to Idaho's collateral bar rule. First, Idaho Rule of Civil Procedure 60(b)(4) provides that "[o]n a motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding if the judgment is void." I.R.C.P. 60(b)(4). "A void judgment is a nullity, and no rights can be based thereon; it can be set aside on motion or can be collaterally attacked at any time." *Prather v. Loyd*, 86 Idaho 45, 50, 382 P.2d 910, 912 (1963) (citations omitted). A void judgment is generally one involving a jurisdictional defect. *See Jim & Maryann Plane Fam. Tr.*, 157 Idaho at 933, 342 P.3d at 645 (citations omitted) (listing jurisdictional defects that render a judgment void). Second, as the Idaho Court of Appeals recognized in *Reeves*, a contemnor may challenge an order if it is "transparently invalid or had only a frivolous pretense to validity." 112 Idaho at 579, 733 P.2d at 800 (quoting *Walker v. Birmingham*, 388 U.S. 307, 315 (1967)). The Court of Appeals has explained, however, that convincing an appellate court that a lower court's order or judgment is "transparently invalid" is a heavy burden and that the better course of action is to bring the error to the issuing court's attention rather than risk contempt. *Reeves*, 112 Idaho at 580, 733 P.2d at 801. Third, a contemnor may challenge an order if its terms are not specific and definite. *See State v. Le Veque*, 164 Idaho 110, 116, 426 P.3d 461, 467 (2018) ("Allowing punishment only for disobedience to specific and definite orders accords with notions of fairness and due process.").

In this case, Snap contends that the contempt court did not have the authority to consider the validity of the preliminary injunction because VR/Landers' and Croghan's motions to dismiss collaterally attacked the preliminary injunction issued by the trial court. In response, VR/Landers contend that the collateral bar rule is inapplicable because the contempt court "stepped in the shoes of [the district court] . . . with authority over the injunction and discretion to review its enforcement in the context of a criminal contempt proceeding."

The case before us is in an unusual posture. Initially, the trial court summarily granted Snap's requests to hold VR/Landers in contempt of court for violating its preliminary injunction order. However, as we recently explained, Rule 75 of the Idaho Rules of Civil Procedure does not allow for the adjudication of non-summary contempt through a summary proceeding. *See Abell v. Abell*, 172 Idaho 531, ___, 534 P.3d 957, 969 (2023). After recognizing its error, the trial court rescinded its prior orders sanctioning VR/Landers for contempt, recused itself from presiding over further contempt proceedings, and the contempt proceedings were then reassigned to the contempt court.

22

Following this reassignment, Snap requested VR/Landers and Croghan be held in contempt of the preliminary injunction order and sought criminal sanctions, including the imposition of large fines and jail time. In response, VR/Landers and Croghan requested the contempt court dismiss Snap's charges of contempt, arguing that the preliminary injunction was vague and overbroad. Croghan further argued that the contempt court lacked personal jurisdiction due to defects in Snap's service of process and that the long-arm statute did not afford the contempt court personal jurisdiction. The contempt court agreed with VR/Landers and Croghan and dismissed the contempt charges on these bases, holding that the preliminary injunction issued by the district court was vague, overbroad, and "patently unenforceable."

Based on this unique procedural posture and the recognized exceptions to this rule, we conclude that the collateral bar rule did not prevent the contempt court from dismissing Snap's charges of contempt. The bases for the contempt court's order of dismissal largely addressed recognized exceptions to Idaho's collateral bar rule. As discussed above, the collateral bar rule does not preclude a contemnor from challenging the enforceability of an order on the grounds that its terms are not "specific and definite" or due to jurisdictional defects. Thus, the collateral bar rule could only have prevented VR/Landers and Croghan from challenging the enforceability of the injunction on the basis that it was overly broad. However, because the trial court recused itself from the contempt proceedings during the pendency of the underlying litigation, we agree with VR/Landers and Croghan that they should be allowed to challenge the preliminary injunction on overbreadth grounds because the preliminary injunction entered by the trial court was not a final appealable judgment. If the trial court had not recused itself, it could have examined the scope of the preliminary injunction while the contempt motions were pending and modified the scope of its order. Given the unique posture of this case, the reasons underlying the application of the collateral bar rule simply do not exist.

Snap further contends that the doctrine of res judicata estopped VR/Landers from challenging the enforcement of the preliminary injunction because the trial court had denied similar challenges to its enforcement and because a final judgment was entered against them. We disagree because there was a not a final judgment entered in the case at the time VR/Landers took this position.

The doctrine of res judicata is well understood:

23

> The doctrine of res judicata covers both claim preclusion (true res judicata) and issue preclusion (collateral estoppel). Claim preclusion bars a subsequent action between the same parties upon the same claim or upon claims relating to the same cause of action . . . which might have been made. Issue preclusion protects litigants from litigating an identical issue with the same party or its privy. Separate tests are used to determine whether claim preclusion or issue preclusion applies.

*Ticor Title Co. v. Stanion*, 144 Idaho 119, 123, 157 P.3d 613, 617 (2007) (citations and quotations omitted). However, the tests for both res judicata and collateral estoppel require a final judgment on the merits in the prior litigation. *See Id*. at 124, 157 P.3d at 618. "As a general rule, a final judgment is an order or judgment that ends the lawsuit, adjudicates the subject matter of the controversy, and represents a final determination of the rights of the parties." *Int. of Dudley*, 167 Idaho 56, 58, 467 P.3d 420, 422 (2020) (quoting *Spokane Structures, Inc. v. Equitable Inv., LLC*, 148 Idaho 616, 620, 226 P.3d 1263, 1267 (2010)). In this case, the preliminary injunction would not qualify as a final judgment because it is, by its nature, a temporary measure to maintain the status quo until the case could proceed to trial. *See Gem State Roofing, Inc. v. United Components*, *Inc.*, 168 Idaho 820, 834, 488 P.3d 488, 502 (2021) ("A preliminary injunction is a temporary injunction effective for the pendency of the litigation before the merits of the case are decided. I.R.C.P. 65(e)."). And the judgment entered after trial would not qualify as a final judgment because Snap subsequently filed a motion for an additur on October 13, 2021. This motion obviated the finality of the judgment later entered by the trial court on October 15, 2021, because there was no longer a final determination of the rights of the parties while the motion was pending before the trial court. Therefore, res judicata is inapplicable to this case because the preliminary injunction was not a final order.

Consequently, VR/Landers and Croghan were not barred from challenging the enforceability of the preliminary injunction, and we must next consider whether the contempt court erred in dismissing the charges of contempt.

### 2. *The contempt court did not err in holding that the preliminary injunction was unenforceable.*

Next, Snap contends that the contempt court erred in dismissing its charges of contempt because the language of the preliminary injunction was reasonably specific. Snap also argues that the former sales representatives knew what conduct the order prohibited, which Snap could establish at trial.

Challenges to the language of an injunction generally take two forms. First, a party may challenge an injunction on the grounds that it is vague. *See Grayned v. Rockford*, 408 U.S. 104, 108 (1972) ("An order too vague to understand contravenes due process standards: It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). An injunction is vague if it fails to satisfy the specificity requirements set out in Rule 65(d)(1), which, in summary, states: " '[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . .' " *Citizens Against Range Expansion v. Idaho Fish & Game Dep't*, 153 Idaho 630, 634, 289 P.3d 32, 36 (2012) (citing I.R.C.P. 65(d)(1)). In addressing Rule 65(d)'s federal counterpart, the United States Supreme Court has explained, "[t]he Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S 473, 476-77 (1974) (per curiam). "[T]hus, Rule 65(d) 'is satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden' or required." *Citizens Against Range Expansion*, 153 Idaho at 635, 289 P.3d at 37 (quoting *Petrello v. White,* 533 F.3d 110, 114 (2d Cir.2008)).

Second, a party may challenge an injunction on the grounds that it is overly broad. "An injunction is overly broad when there is a risk that it restrains legal conduct, or the injunction prohibits illegal conduct that is not the subject of the litigation or is not closely related to the conduct found to justify injunctive relief." *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 364 (6th Cir. 2022) (citing *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 360-61 (6th Cir. 1998)). "A preliminary injunction is the 'strong arm of equity' which, as an extraordinary remedy, must be exercised with great restraint." *Planned Parenthood Great Nw. v. State*, 172 Idaho, 321, 325, 532 P.3d 801, 805 (2022) (citation omitted). Therefore, "[a]n injunction 'should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court.' " *City & Cnty. of San Francisco v. Barr,* 965 F.3d 753, 765 (9th Cir. 2020) (quoting *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011)).

While these challenges are similar insofar as each concerns the proper scope of an injunction, each challenge is unique. As Wright & Miller note in their treatise discussing the Rule 65 federal counterpart, the "broadness" of an injunction pertains to the range of activity that is

prohibited by the order whereas "vagueness" pertains to whether the prohibited conduct has been described with sufficient particularity:

> It is important to note that the scope of an injunction or restraining order may be broad but at the same time the draft is in a manner that is not vague, but that is specific and precise. There is no inherent inconsistency between the two characteristics. Broadness encompasses the range of activity brought within the parameters of the decree; a decree is vague when the delineation of the prescribed activity lacks particularity.

11A Charles A. Wright et al., *Federal Practice & Procedure* § 2955 (3d ed.).

In this case, the contempt court determined that the preliminary injunction was unenforceable because (1) the terms of the preliminary injunction were vague and failed to comply with the specificity requirement of Rule 65(d); and (2) the scope of the preliminary injunction was overly broad because it imposed Snap's non-compete and non-solicitation covenants against employees who were no longer bound to these covenants.

> a. <u>The preliminary injunction complies with the specificity requirements of Idaho Rule of Civil Procedure 65(d)</u>.

Whether a court order is vague is a question of law; and interpretation of an unambiguous court order is also a question of law. *See Vierstra v. Vierstra*, 153 Idaho 873, 880, 292 P.3d 264, 271 (2012) (discussing the standard for an ambiguous order). Thus, we consider the relevant language of the preliminary injunction that the contempt court determined was vague. The trial court's preliminary injunction enjoined VR/Landers and "anyone acting in concert or on behalf of" VR/Landers from:

1. Directly or indirectly soliciting any Snap customer or Business Partner, i.e. schools and independent organizations, who were served by a Vertical Raise sales representative formerly employed by Snap[] and where such individual was employed by Snap[] for any product or service similar to or competitive with one offered by Vertical Raise in the same geographic area in which former Snap[] employees performed services for Snap[].

2. Transacting business with any Snap[] customer, Business Partner, or organization who was served by a Vertical Raise sales representative formerly employed, engaged, or contracted with by Snap[] and that individual was employed by Vertical Raise in the same geographic area in which that former Snap[] employee performed Services for Snap[].

3. Soliciting or accepting business from any Snap[] customer, Business Partner, or organization in the same geographic area in which any Vertical Raise sales representative formerly employed, engaged, or contracted with by Snap[]

26

performed services for Snap[] who were served by that former Snap[] employee while he/she was employed by Snap[].

4. Paying any sales representative formerly employed by Snap[] any form of compensation for transacting business with a current or former Snap[] customer, Business partner, or organization who was served by that sales representative while he/she was employed, engaged, or contracted with by Snap[] in the geographic area in which that sales representative performed services for Snap[].

. . . .

Each of the ninety-three contempt charges Snap raised against VR/Landers and Croghan alleged violations of one or several of these provisions and did not concern other provisions of the preliminary injunction. The contempt court concluded that paragraphs 1 through 4 failed to meet the specificity requirements of Rule 65(d) because the following terms and phrases in these paragraphs were not clearly defined: (1) the term "geographic area," (2) the phrase "customer, Business Partner, or organization," and (3) the qualifying phrases "who was served," "who were served," and "engaged."

To be sure, the terms of the order could have been drafted in a clearer manner. However, these terms are not so vague as to render them unenforceable. Take, for example, the term "geographic area," which was the center of the vagueness dispute. The contempt court determined that the use of the phrase "geographic area" was vague because the phrase was never defined:

> [A]side from Snap arguing that its meaning is "self-explanatory," no one appears to know the meaning of that phrase. The preliminary injunction provides no guidance as to the scope of the geographic area. For example, does the "geographic area" consist of a state, a city, a school district, or a particular school? Is "geographic area" defined by reference to city, county, or state boundary lines? Or is "geographic area" defined by specific distances, e.g., within 25 miles of a particular customer's location? Or is "geographic area" simply as nebulous and subjective as wherever a particular sales representative considers their home territory to be? The injunction fails to address any of these questions.

We disagree. This term is not nebulous, nor is it undefined. The "geographic area" of each former sales representative is the area "in which [the] former [Snap employee] performed services for Snap." Each of the former representatives was assigned an area to provide services for Snap's clients, these areas were known to the former representatives, and the parameters of these areas can be established by Snap during a contempt trial. While the contempt court may have preferred an addendum outlining each of the former sales representatives' geographic areas, the focus of the analysis is whether the "*enjoined party* can ascertain from the four corners of the order precisely

27

what acts are forbidden." *Citizens Against Range Expansion*, 153 Idaho at 634, 289 P.3d at 36 (emphasis added). The order's four corners sufficiently describe the acts forbidden.

To illustrate this point, consider the following scenario. Boise State Landscape, LLC, provides professional lawn care services throughout the state of Idaho. Each sales employee of Boise State Landscape signed a non-compete agreement and was assigned a specific geographic area to achieve sales objectives and targets. An employee's geographic area could range from a single city to multiple cities, depending on population size. Landscaper Joe is assigned the cities of Moscow and Lewiston as his geographic area. After Joe and thirty-six other employees left Boise State Landscape to work for Vandal Lawn Services, a court enjoined the former employees from "selling lawn care services in the geographic area in which former Boise State Landscape employees performed services for Boise State Landscape." Subsequently, Boise State Landscape filed charges of contempt against Joe for selling lawn care services in Lewiston and Joe moved to dismiss the charges on the grounds that the order's use of the term "geographic area" rendered it vague. Would the geographic area specified in the injunction satisfy the specificity requirements of Rule 65(d)? Yes. The injunction prohibited Joe from selling lawn care services in the geographic area where he formerly worked. That geographic area was not spelled out in the injunction or in an appendix to the injunction, as the contempt court may prefer, but the injunction did contain sufficient information to inform Joe what acts were forbidden and the actual boundaries of his former sales territory could be proven as a matter of fact at a contempt trial. And if it turns out Joe only provided landscape services for Vandal Lawn Services in Coeur d'Alene, and not Moscow or Lewiston, then Boise State Landscape would have failed to present evidence on an essential element of its case and Joe would be acquitted.

Here, each of the former employees was assigned to work in specific geographic areas to provide Snap's customers with its online fundraising software. These geographic areas were not spelled out in the injunction, but they are known to the former representatives and Snap. Snap has the burden to establish the areas for each representative during the contempt proceedings. While Rule 65(d), overall, prefers certainty to flexibility, this rule is not so inflexible as to require an appendix outlining the geographic areas of each former sales representative.

Next, neither the phrase "Snap[] Customer or Business Partner, i.e. schools and independent organizations," nor the qualifiers "who was served," "who were served," and "engaged" are so vague as to render the injunction unenforceable.

First, the contempt court raised questions about what the term "customer, Business Partner, i.e. schools and independent organizations" means:

> Again, it is unclear what is included in the phrase "customer, Business Partner, or organization," even with the simple definition provided. Would a student run fundraiser be included if Snap did business with a coach at that same school . . . If Snap worked with one organization at a school, are all organizations considered off limits even if those organizations never worked with Snap?

The answers to the contempt court's questions are all "yes." If Snap worked with one group at the school, then the entire school would fall under the injunction's scope because the school is the customer, not a particular student group or a coach.

Second, the contempt court further raised issues with whether the injunction applied to former Snap customers that no longer had a contract with Snap or future customers:

> What about a customer, business partner, or organization that no longer had a contract with Snap?
> . . .
> In those paragraphs, the [qualifiers are] in past tense presenting the reader with the question of whether it applies to customers served prior to the lawsuit or the injunction? Does the past tense phrase apply to customers Snap serves in the future or during the pendency of the case?

The injunction's past tense use of "serve" does not limit the injunction's application to customers Snap served prior to the lawsuit or the injunction; instead, it could apply to customers served before the injunction was issued *and* it also could apply to customers who are served by Snap during the pendency of the case. When interpreting the scope of this provision, the paragraphs must be read as a whole and not in isolation. Take paragraph one for example. To prove a violation of paragraph one in a contempt proceeding, in addition to showing that the contemnor's violation was "willful," *In re Weick*, 142 Idaho at 280, 127 P.3d at 183, Snap must also prove the following six elements:

(1) That Vertical Raise or "anyone acting in concert or on behalf of" Vertical Raise,
(2) solicited,
(3) any schools and independent organizations,
(4) who were served by a Vertical Raise sales representative formerly employed by Snap,
(5) where such individual was employed by Snap for any product or service similar to or competitive with one offered by Vertical Raise, and
(6) in the same geographic area in which former Snap employees performed services for Snap.

29

Nothing in these elements makes any distinction between customers Snap previously served before the injunction and customers Snap representatives may serve during the pendency of the case. If a Snap representative provided software services to a new school after the preliminary injunction was issued, was then hired by Vertical Raise, and attempted to sell Vertical Raise's software to that *same* school at a later time, then the injunction would be violated. The order provides Snap with the means to enforce the terms of its employment agreements throughout the lawsuit.

Third, the contempt court raised issues with the injunction's use of the word "served":

> More troubling than the tense, is divining what "serve" means . . . Is "served" the same as becoming a customer? Does that phrase mean that Snap actually worked with a client contractually? Or is one "served" if Snap merely discusses working with a potential client? This [c]ourt is uncertain how and in which ways Snap "served" its customers, business partners, and organizations.

Snap and Vertical Raise are in the business of providing fundraising software services to schools. If a former Snap employee provided these services to Lake City High School's debate team, then Lake City High School was the customer who was "served" for the purposes of the injunction.

For these reasons, we conclude that the language of the preliminary injunction complies with the specificity requirements of Rule 65(d).

b. <u>The preliminary injunction is overly broad because it restrains lawful conduct</u>.

Next, we address the contempt court's conclusion that the preliminary injunction was overly broad. As discussed above, "[a]n injunction is overly broad when there is a risk that it restrains legal conduct[.]" *Union Home Mortg. Corp.*, 31 F.4th at 364.

In our view, Snap's arguments challenging the order of dismissal only marginally addressed the contempt court's holding that the preliminary injunction was overly broad, if at all. At most, Snap argued that Rule 65(d) does not require that the trial court issue a preliminary injunction that only "prohibited conduct that was also prohibited by the Snap[] contracts." We agree that Rule 65(d) does not prohibit overly broad injunctions:

> Overly broad or sweeping injunction may have been held not to comply with the requirements of Rule 65(d), however, even though the rule does not expressly deal with that problem. Since a question of over broadness typically is closely related to the content of the governing substantive law, in the sense that it really deals with the question of the propriety of issuing the order prohibiting a certain spectrum of conduct, it appears to be improper to strike down an over broad injunction solely on the basis of noncompliance with the specificity requirement of Rule 65(d).

Wright et al., supra, § 2955. Nonetheless, a trial court fails to "reach its decision by the exercise of reason" *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018), by issuing an injunction that risks restraining legal conduct, and, in effect, grants greater than complete relief to the plaintiff.

While ordinarily the failure to address the alternative grounds for the contempt court's decision would be fatal to an appeal, we will address the merits here because VR/Landers challenge the breadth of the permanent injunction, which largely mirrors the preliminary injunction. *See T3 Enterprises, Inc. v. Safeguard Bus*. Sys., Inc., 164 Idaho 738, 755, 435 P.3d 518, 535 (2019) (quoting *Andersen v. Prof'l Escrow Servs., Inc.*, 141 Idaho 743, 746, 118 P.3d 75, 78 (2005)) ("When a decision is 'based upon alternative grounds, the fact that one of the grounds may be in error is of no consequence and may be disregarded if the judgment can be sustained upon one of the other grounds.' ").

We agree with the contempt court that provisions (1) through (4) of the preliminary injunction are overly broad, because they granted Snap injunctive relief beyond what it was entitled to under the provisions of its employment contracts and therefore restrained lawful conduct. Snap's efforts to enforce the preliminary injunction illustrate this point. Of the ninety-three charges of contempt, twenty-one of the charges involved former Snap sales representatives who joined Vertical Raise after their non-compete and non-solicitation covenants had expired under Snap's employment agreement. Another twenty-three of the charges concerned former Snap sales representatives based in California, such as Croghan, who are not subject to the non-compete provisions of Snap's employment agreement under California law. As the contempt court stated:

> Croghan is accused in this contempt action of violating paragraphs (1) through (4) of the injunction. These paragraphs of the injunction purport to enforce Snap's non-compete and non-solicitation contracts with its former employees. The problem, of course, is that Croghan's conduct, alleged to be in violation of the non-compete and non-solicitation contracts, all occurred in California. As [the trial court] earlier ruled: "It is clear to this [c]ourt that Snap's California non-compete and non-solicitation clauses are void *ab initio* under California Code § 16601 and California Case Law." Put simply, even though Snap's non-compete and non-solicitation contracts with Croghan were void *ab initio*, Snap asks this [c]ourt to jail and fine Croghan for violating those very clauses. That these void contract clauses are now cloaked with a judicial order, in the form of a preliminary injunction, does not magically transform these void clauses into enforceable super-contracts punishable with criminal sanctions. That is, a judge cannot create a remedy in contempt for an underlying non-enforceable contract. Because Snap convinced [the district court]

31

to broadly include those clauses with no carve outs for California actors-the injunction is patently unfair, overreaching, and unenforceable as to Croghan.

In short, the injunction clearly prohibited lawful conduct and the trial court abused its discretion in granting the overly broad injunction. For this reason, we hold that the contempt court did not err in dismissing the charges of contempt. Because the contempt court's order dismissing the charges of contempt against VR/Landers and Croghan is affirmed on this basis, we do not reach the alleged contemnors' defenses based on process immunity and lack of personal jurisdiction.

### D. The permanent injunction is overly broad.

VR/Landers contend that the trial court erred in granting the permanent injunction, because the order was vague and overly broad. Before addressing the merits of this argument, we must first determine whether this issue is moot.

"Generally, appellate review of an issue will be precluded where an issue is deemed moot." *State v. Manley*, 142 Idaho 338, 343, 127 P.3d 954, 959 (2005). "An issue is moot if it presents no justiciable controversy and a judicial determination will have no practical effect upon the outcome." *Edmondson v. Finco*, 172 Idaho 421, 533 P.3d 1012, 1015 (2023) (quoting *Frantz v. Osborn*, 167 Idaho 176, 180, 468 P.3d 306, 310 (2020)). Here, the trial court's permanent injunction contained the same provisions as the preliminary injunction, except that it applied for a "period of (18) months from the date of entry of Judgment in this case[.]" This duration expired during the pendency of this appeal, and therefore, the issue is now moot. However, one exception to the application of the mootness doctrine occurs "when there is the possibility of collateral legal consequences imposed on the person raising the issue[.]" *Koch v. Canyon County*, 145 Idaho 158, 163, 177 P.3d 372, 377 (2008) (quoting *AmeriTel Inns, Inc. v. Greater Boise Auditorium Dist.*, 141 Idaho 849, 851–52, 119 P.3d 624, 626–27 (2005)). We conclude that this exception is applicable here because the permanent injunction may form the basis for further contempt proceedings.

For the reasons discussed above, we reject VR/Landers' argument that the language of the permanent injunction was vague. We also determine that, like the provisions of the preliminary injunction, the provisions of the permanent injunction are overly broad because they granted greater relief to Snap than it was entitled to under the terms of its employment contracts. The permanent injunction is also overly broad because, by its terms, it applies not only to VR/Landers,

but also to "their employees, independent contractors, servants, and agents, and anyone acting in concert or on behalf of Vertical Raise, LLC and Paul Landers . . . for a period of eighteen (18) months from the date of entry of Judgment in this case." The trial court justified the eighteen-month duration based on the employment agreement's non-competition, non-solicitation, and non-acceptance of business covenants, which expired eighteen months after employment with Snap ended.

However, as written, the permanent injunction appears to apply to *each* former employee, regardless of whether the employee's eighteen-month period had expired under the terms of Snap's employment agreement. By failing to carve out exceptions for former Snap sales representatives who are no longer subject to the restrictive covenants that are central to the permanent injunction, or former sales representatives in Washington and California who were not subject to the restrictive covenants, the permanent injunction was "more burdensome . . . than necessary to provide complete relief" to Snap. *City & Cnty. of San Francisco*, 965 F.3d at 765 (citation omitted). Accordingly, we conclude that the trial court failed to "reach its decision by the exercise of reason" *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194, by issuing an injunction that unduly restrains legal conduct. Therefore, we reverse the trial court's order granting the permanent injunction. As the eighteen-month duration for the permanent injunction has now expired, no injunction shall issue on remand.

### E. A new trial judge is not warranted on remand.

VR/Landers request that a new trial judge be assigned on remand, listing various decisions made by the trial court which "call into question its ability to fairly oversee the remaining proceedings, whatever they may be." VR/Landers did not, however, appeal the trial court's denial of the motion to disqualify itself after the trial court's daughter joined Snap's counsel as an attorney. Instead, VR/Landers ask this court to exercise its own inherent authority to find that "a new judge would provide a much needed fresh perspective and would eliminate any concern of bias[,]" citing *Capstar Radio Operating Co. v. Lawrence*, 153 Idaho 411, 424, 283 P.3d 728, 741 (2012). We disagree because the remand to the trial court requires only the entry of an amended judgment consistent with this opinion, a ministerial task. Accordingly, we will not order the appointment of a new district judge.

33

**F. Croghan is awarded attorney fees on appeal, but all other fee requests are denied.**

In the first proceeding (Supreme Court Docket Number 49418), Snap requests an award of attorney fees on appeal under Idaho Code section 12-121. "Under section 12-121, we award attorney fees to the prevailing party, as a matter of discretion, if we find an appeal was 'pursued, defended, or brought frivolously, unreasonably, or without foundation.' " *Asher v. McMillan*, 169 Idaho 701, 711, 503 P.3d 172, 182 (2021) (citing *Idaho Military Hist. Soc'y, Inc. v. Maslen*, 156 Idaho 624, 632–33, 329 P.3d 1072, 1080–81 (2014)). We hold there is no prevailing party given the mixed results of this appeal and decline to award Snap attorney fees on appeal.

In the second proceeding (Supreme Court Docket Number 49483), Snap, VR/Landers, and Croghan request attorney fees on appeal. VR/Landers seek an award of attorney fees pursuant to Idaho Appellate Rule 41 but did not specify a statutory basis authorizing an award of fees. This Court has " 'repeatedly held that simply requesting an award of attorney fees pursuant to Idaho Appellate Rule 41, without citing any statutory or contractual basis for the award, is insufficient to raise the issue of attorney fees on appeal.' " *Sallaz v. Rice*, 161 Idaho 223, 230, 384 P.3d 987, 994 (2016) (quoting *International Real Estate Solutions, Inc. v. Arave*, 157 Idaho 816, 821–22, 340 P.3d 465, 470–71 (2014)). "A party must point to a statute or contractual provision authorizing an award of attorney fees on appeal." *Ticor Title Co. v. Stanion*, 144 Idaho 119, 127, 157 P.3d 613, 621 (2007). Therefore, we decline to award VR/Landers attorney fees on appeal.

Snap and Croghan seek an award of attorney fees pursuant to Idaho Rule of Civil Procedure 75(m). However, Rule 75(m) is a "rule of civil procedure applicable 'in the district courts and the magistrate's divisions of the district courts in the state of Idaho.' " *State Dep't of Health & Welfare v. Slane*, 155 Idaho 274, 279, 311 P.3d 286, 291 (2013) (quotation omitted); *see also* I.R.C.P. 1(b). It does not provide a basis for attorney fees on appeal. *See* 155 Idaho at 279, 311 P.3d at 291. Therefore, we decline to award Croghan and Snap attorney fees on appeal.

Croghan also seeks an award of attorney fees under Idaho Code section 7–610. Idaho Code section 7–610 provides that, in a contempt proceeding, "the court in its discretion, may award attorney's fees and costs to the prevailing party." Because Croghan is a prevailing party, we award him attorney fees on appeal to be paid by Snap.

### IV. CONCLUSION

In the first proceeding (Supreme Court Docket Number 49418), we reverse the trial court's order granting an additur or new trial and remand with instructions to enter an amended judgment

consistent with this opinion. We affirm the trial court's award of discretionary costs for Martin's expert witness fees. We reverse the trial court's decision granting Snap a permanent injunction. Since the permanent injunction has expired, no further injunction shall issue. No appeal costs are awarded to either Snap or VR/Landers because each has prevailed in part in the appeal from the trial court. Snap is not awarded attorney fees on appeal.

In the second proceeding (Supreme Court Docket Number 49483), the contempt court's order dismissing the charges of contempt is affirmed. The contempt court's award of costs and fees to Croghan and VR/Landers is affirmed. Costs are awarded to VR/Landers and Croghan as the prevailing parties on this appeal. Croghan is awarded attorney fees on appeal. Snap and VR/Landers are not awarded attorney fees on appeal.

Chief Justice BEVAN, Justice MOELLER, and Justice Pro Tem BASKIN CONCUR.


STEGNER, J., concurring in the result but dissenting from the analysis in Sections C.2.a. and D. of the majority's opinion.

Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail, and not by referring to the complaint or other document, the act or acts restrained or required. I.R.C.P. 65(d)(1). The purpose and scope of this section of the rule is "to prevent the issuance 'of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds.' " *Citizens Against Range Expansion v. Idaho Fish and Game Dep't*, 153 Idaho 630, 634–35, 289 P.3d 32, 36–37 (2012) (quoting *Petrello v. White*, 533 F.3d 110, 114 (2d Cir. 2008)).[1] Thus, "Rule 65(d) is satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden or required." *Id*.

In other words, "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1047–48 (9th Cir. 2013) (quoting 11A Charles A. Wright et al., *Federal Practice & Procedure* § 2955 (2d ed.)). "The specificity provisions of Rule 65(d) are no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). "The Rule was designed

---

[1] Federal Rule of Civil Procedure 65 is virtually identical to Idaho Rule of Civil Procedure 65. *See* F.R.C.P. 65. Therefore, commentary on the federal rule and cases interpreting the federal rule are instructive here. *See, e.g.,* 11A Charles A. Wright et al., *Federal Practice & Procedure* (3d ed.).

35

to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Id.* "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id.*

Here, the contempt court held the injunction failed to satisfy Rule 65's specificity requirements because it did not clearly define: (1) the term "geographic area," (2) the phrase "customer, Business Partner, or organization," and (3) the qualifiers "who was served," "who were served," and "engaged," in the following paragraphs:

1. Directly or indirectly soliciting any Snap! customer or Business Partner, i.e. schools and independent organizations, who were served by a Vertical Raise sales representative formerly employed by Snap! and where such individual was employed by Snap! for any product or service similar to or competitive with one offered by Vertical Raise in the same geographic area in which former Snap! employees performed services for Snap!.

2. Transacting business with any Snap! customer, Business Partner, or organization who was served by a Vertical Raise sales representative formerly employed, engaged, or contracted with by Snap! and that individual was employed by Vertical Raise in the same geographic area in which that former Snap! employee performed Services for Snap!.

3. Soliciting or accepting business from any Snap! customer, Business Partner, or organization in the same geographic area in which any Vertical Raise sales representative formerly employed, engaged, or contracted with by Snap! performed services for Snap! who were served by that former Snap! employee while he/she was employed by Snap!.

4. Paying any sales representative formerly employed by Snap! any form of compensation for transacting business with a current or former Snap! customer, Business partner, or organization who was served by that sales representative while he/she was employed, engaged, or contracted with by Snap! in the geographic area in which that sales representative performed services for Snap!.
   . . . .

At the center of the vagueness dispute is the key phrase "geographic area." As noted by the contempt court, "geographic area" is not defined anywhere in the injunction. In fact, there is no guidance as to the scope of any given geographic area. Even so, the majority holds the language of the preliminary injunction complies with the specificity requirements of Rule 65(d). The majority reasons that because each of the former employees' assigned areas were known to them, Snap will be able to establish the geographic areas for each representative during the contempt proceedings, regardless of whether those areas are spelled out in the injunction.

36

However, the geographic areas assigned to each representative are much less clear than the majority suggests. For example, one former sales representative described his territory as "the Phoenix metro area, to include – at times, to include Scottsdale, at times not." Not only are the boundaries of this geographic area uncertain, but also the representative's definition of his assigned geographic area appears to fluctuate based on the day. This leaves a high level of uncertainty based on the representative's understanding of his assigned territory. "The Phoenix metro area" is simply too uncertain to comport with the specificity required.

Another sales representative described his territory as "essentially 45, I-45 run north and south 15 through Houston, east of Interstate 45." As described by the contempt court:

> Trying to apply what "essentially 45" means in a criminal contempt trial would be nearly impossible. Imagine all the areas that parties could legitimately dispute fall into the area around "I-45 and south 15 through Houston." What if a school is within five miles of I-45? Is that part of [the representative's] territory? What if it is within 10 miles? 25 miles? 50 miles? 60 miles? Nobody knows; nobody could possibly know on such subjective, nebulous definitions.

There is simply no guidance as to the scope of what is meant by "geographic area." Can "geographic area" be broad enough to encompass an entire state? During discovery, Snap asserted that a separate sales representative's territory consisted of the "Northeast United States." Can "geographic area" include multiple unnamed states? Is it defined by a specific distance to a specific customer's location? By failing to include a specific definition within the injunction, representatives are left to their subjective opinions on what constituted their particular "geographic area" at a particular time.

Wright & Miller succinctly articulate the problem with allowing these kinds of subjective opinions to control an injunction:

> If the order is vague or too general, a bold individual, left to determine exactly what conduct has been enjoined, might end up engaging in the activity that the court is seeking to prevent, thereby defeating its utility. On the other hand, a less aggressive individual might refrain from undertaking innocent or even desirable conduct because of concern about the possibility of being held in contempt.

11A Charles A. Wright et al., *Federal Practice & Procedure* § 2955 (3d ed.).

In *National Labor Relations Board v. Teamsters, Chauffeurs, Helpers & Taxicab Drivers, Local Union 373*, the Sixth Circuit held an order requiring the local union to cease and desist from restraining or coercing "employees of any other employer within its jurisdictional territory" to commit various acts of picketing could not be enforced because it failed to meet the specificity

requirement contained in Rule 65(d). 419 F.2d 1282, 1283 (6th Cir. 1970). Relevant here, the Sixth Circuit recognized "the order does not define the jurisdiction of Local 327 and thus it provides no means of defining the people for whom protection is sought." *Id.* I would posit that there is no substantive distinction between a union's "jurisdictional territory" and a sales representative's "geographic area" for the purposes of specificity.

Rule 65(d) was designed to prevent uncertainty and "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Lessard*, 414 U.S. at 476. This is a high standard to meet, but not an impossible one. For example, one sales representative described his territory as "60 miles in any direction from the epicenter (my address at xxxx xxxxxxx Street, Philadelphia, PA, 19146)." This level of specificity demonstrates that Snap could have provided clear boundaries in the injunction in lieu of referring to the infinitely more general "geographic area," but failed to do so.

Ultimately, leaving the injunction's boundaries to each sales representative's subjective opinion may enjoin far more activity and include areas that were not intended to be enjoined. "Geographic area" gives the reader (and this Court) no idea what area is contemplated by the injunction, despite the mandate of Rule 65 that the enjoined party be able to ascertain precisely what acts are forbidden or required "from the four corners of the order." *Citizens Against Range Expansion*, 153 Idaho at 634–35, 289 P.3d at 36–37. The majority attempts to fill in some of these gaps, but it is not this Court's job to salvage poor drafting when it comes to the high standards of an injunction. The contempt court correctly identified the problem created by the phrase "geographic area" contained in the injunction. As a result, the contempt court's decision should be affirmed.

The contempt court additionally found the words "customer, Business Partner, or organization" vague and overbroad:

> Again, it is unclear what is included in the phrase "customer, Business Partner, or organization," even with the simple definition provided. Would a student run fundraiser be included if Snap did business with a coach at that same school? What about a customer, business partner, or organization that no longer had a contract with Snap? If Snap worked with one organization at a school, are all organizations considered off limits even if those organizations never worked with Snap?

The majority answered these questions in the affirmative, concluding that if Snap worked with one group at the school, then the entire school would fall under the injunction's scope because

the school is the customer, not a particular student group or a coach. And whether a school had an active contract with Snap is irrelevant – the injunction makes no exceptions.

However, as with the uncertainty surrounding the term "geographic area," the majority overlooks the specific evidence of ambiguity that was determined by the contempt court. One of Snap's contempt allegations was made against a sales representative who ran a campaign for a wrestling coach. The coach worked as a coach and a gym teacher at a high school and ran a separate youth organization called "Rough Riders." Snap ran a fundraiser for the high school's wrestling team, and a former Snap sales representative ran a fundraiser campaign with Vertical Raise for Rough Riders—the coach's separate and presumably independent organization. Snap argued that Vertical Raise violated the preliminary injunction by running a fundraiser campaign for the Rough Riders because Snap previously ran a fundraiser for that coach's wrestling team.

The ensuing questions posed by the contempt court contemplated whether any organization that the coach becomes associated with automatically become a Snap customer, business partner, or organization. How far could this uncertainty extend? What if subsequent organizations do not want to hire Snap to run their fundraisers? What is necessary for an entity to qualify as a customer of Snap? That Snap communicated with the entity? That Snap previously ran a fundraiser for the entity? What if, as with the coach, Snap worked with an individual running multiple entities, but Snap only worked for one of the entities? The majority opinion fails to adequately address these questions.

Finally, the contempt court found the qualifiers of "who was served," "who were served," and "engaged," were also too vague to comply with Rule 65's specificity requirement. In particular, the contempt court struggled with whether the word "served" only applied when someone became a customer, or whether someone could be "served" simply by discussing a possible opportunity for Snap to work with them. The contempt court found the same questions arose with the term "engaged." The majority dismisses these concerns by focusing on whether "who was served" is limited to a particular timeframe. However, this does not resolve the contempt court's valid question. The question is the extent of what it means to be "served" or "engaged," not when those terms are applicable.

Ultimately, "[t]he judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one." *Int'l Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). With the threat of contempt, an

injunction must be specific and explicit in its terms so that the enjoined party is properly on notice regarding what conduct the injunction prohibits. The injunction in this case has left too many questions unanswered. Accordingly, I respectfully dissent from Section C.2.a. of the majority's opinion. I would affirm the contempt court's determination that the injunction failed to meet the specificity requirements of Rule 65(d).

I also disagree with the majority's statement in Section D. that "[f]or the reasons discussed above, we reject VR/Landers argument that the language of the permanent injunction was vague." As noted above, I would hold that the preliminary injunction is vague. Because the preliminary injunction and the permanent injunction are identical, I would likewise hold that the permanent injunction is vague.

Other than my disagreement with these two portions of the majority's opinion, with which I respectfully dissent, I join in the remainder of the majority's opinion and with its ultimate result.